OPINIONS OF THE SUPREME COURT OF OHIO

The full texts of the opinions of the Supreme Court of Ohio are being transmitted electronically beginning May 27, 1992, pursuant to a pilot project implemented by Chief Justice Thomas J. Moyer.

Please call any errors to the attention of the Reporter's Office of the Supreme Court of Ohio. Attention: Walter S. Kobalka, Reporter, or Deborah J. Barrett, Administrative Assistant. Tel.: (614) 466-4961; in Ohio 1-800-826-9010. Your comments on this pilot project are also welcome.

NOTE: Corrections may be made by the Supreme Court to the full texts of the opinions after they have been released electronically to the public. The reader is therefore advised to check the bound volumes of Ohio St.3d published by West Publishing Company for the final versions of these opinions. The advance sheets to Ohio St.3d will also contain the volume and page numbers where the opinions will be found in the bound volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Grant, Appellant.
[Cite as State v. Grant (1993), -- Ohio St.3d ---.]
Criminal law -- Aggravated muder -- Death penalty upheld, when.
    (No. 91-13 -- Submitted May 25, 1993 -- Decided October 27, 1993.)
    Appeal from the Court of Appeals for Mahoning County, No. 83 C.A. 144.

GUILT PHASE EVIDENCE

On April 1, 1983, at 6:11 a.m., appellant, Rosalie Grant, called the Youngstown Fire Department to report a fire at 3127 Orrin Avenue, the house where she resided with her two infant sons, Joseph, two years old, and Donovan, one year old. A Youngstown police officer, John Mazzeo, was first on the scene. He saw Grant come out of the house next door, and Grant told him that her house was on fire and her children were inside. Mazzeo attempted a rescue, but was rebuffed by the intense smoke after opening the front door.

When fire fighter Terrance Paige arrived, Grant told him that "[t]he babies are in back." Fire fighters crawled into the smoke-filled house and worked their way to the children's bedroom, the only room in the house that was engulfed in flames. In five to ten minutes, the fire fighters extinguished the blaze, and were able to commence the grisly task of recovering the babies' bodies. They found Joseph first, his head still on fire. They found Donovan in a corner soon after. According to the coroner, the children died from shock and asphyxia due to their extensive burns and inhalation of smoke. The children also suffered thermal skull fractures, which occur when the brain boils and cracks the skull.

Outside the house stood Rosalie Grant, with unsinged hair, no soot on her face or eyes, and fully dressed in pants, jacket, shoes and socks. An ambulance attendant testified that Grant showed no signs of smoke inhalation. Other than her claim to a detective that she had tried to get into the children's room, there was no evidence presented that Grant had attempted to put out the fire or to save the children. Arson investigators determined that the door to the bedroom remained closed during the early and hot stages of the fire, prior to

the arrival of the fire fighters.

At 7:00 a.m., Coroner's Investigator Angelo Kissos observed the two severely burned corpses at the hospital. Then Kissos spoke to Grant in the hospital's grief room. Grant told Kissos she had put the children to bed around 8:00 p.m., gave them some juice and water around 11:30 p.m., and then went to bed around 1:00 a.m. Grant asserted that the child Joe at times played with matches and had turned on the kitchen stove the night before.

Fire fighters noticed the unusual nature of the blaze early on. The fire was suspicious in that it was confined to only one room of the house, the babies' bedroom, and there was an unusual explosive flash after the fire was under control. Fire fighters and other investigators testified that while there was only minimal smoke damage in the other rooms, the children's bedroom was completely gutted.

Around 9:30 a.m. on the morning of the fire, John Zamary, a Youngstown fire department inspector, and Thomas Naples, an arson squad investigator, began to inspect the fire scene. Zamary discovered unusual deep burn patterns on the bedroom floor -- there was a hole burned in and around the heat register beneath the bedroom window, and a hole burned in the cold-air return next to the door. Several other deep burns were found in the floor between the door and the window. Both Zamary and Naples smelled a flammable liquid or a petroleum-type odor throughout the bedroom. Zamary eliminated electrical or heating problems as a cause and concluded that the fire had been intentionally set and that a liquid accelerant had been used.

In searching the basement of the house, Naples found remains of several previous fires. A table and a door and frame in the basement had burned, there was evidence of a fire in a crawl space, and the basement fuse box had charred paper and liquid in it. Zamary and Naples noticed that the liquid had the same petroleum-type odor as the bedroom.

Detective Michael Landers spoke with Grant about the basement fires. Grant told him that the basement table fire had occurred several months previously while she was in the house, but she did not know how it was started or how it was extinguished. She denied knowing about the other basement fires.

On April 5, Landers found a new can of charcoal lighter fluid and a partially burned kitchen chair inside a nearby vacant house. Except for the can and the chair, everything in the vacant house was dirty and dusty. The burned chair was of the same design and appearance as those in Grant's kitchen. The can bore her fingerprints. Chromatography analysis of the liquid from the can revealed hydrocarbon liquid very similar to the liquid found in the fuse box. No liquid sample was taken from the children's bedroom, and thus no comparison was made between the suspected accelerant used there and the charcoal lighter fluid.

Fire Chief Donald Cover, an arson expert, inspected the fire scene during a warrantless search on April 5. Chief Cover concluded that the fire had definitely been caused by arson, fueled by a liquid accelerant. His testimony otherwise corroborated the testimony of Naples and Zamary.

On April 14, Lee Brininger inspected the fire scene on behalf of the insuring fire casualty company. Brininger discerned a "penetrating burn pattern into the [bedroom's] wooden floor, which is indicative of a flammable liquid." He found the bedroom fire definitely to be the result of arson.

In their investigation, police discovered that Grant had purchased $5,000 worth of life insurance for each of the boys about two weeks prior to their deaths. She did not choose double indemnity. Grant listed herself as the policy owner and beneficiary, and received the policies on March 17. Contrary to the advice of her insurance agent, Grant did not purchase a policy for herself or for her three-year-old daughter Shylene, who was living with Grant's grandmother, Rosalie Carson, at the time. Grant had told the insurance agent that Carson already had a policy for Shylene, but Carson flatly denied having any insurance on Shylene or telling Grant she did.

In Grant's defense, several persons testified about strange happenings at the house in the month before the fire. On March 14, 1983, patrolman Leonard Bridges responded to Grant's house to investigate a report of a prowler. He found nothing. Grant told Bridges she had previously had problems with her boyfriend, and that someone had earlier burned clothing in her basement.

Kitty Carson, Grant's sister, described harassing and threatening calls for Grant that she had overheard or answered herself. One female caller said, "You'd better leave me alone," and "If you don't leave me alone, I'm going to kill both you and your kids." After the fire, the same woman called and said that Grant got what she deserved and that "she was supposed to die with them." Carson admitted that Grant may have known the caller, but there was no evidence that Grant ever told the police about the calls.

Lisa Bray, Grant's best friend, testified that she had suggested Grant to the insurance agent as a potential customer. She also testified that Grant started receiving daily threats a month before the fire. Bray recognized the voice as Marie, Grant's rival in a love triangle. Bray testified that Marie told Grant, "You're dead, bitch" and "I'm going to burn your ass." On the night before the fire, Bray testified, she overheard Marie tell Grant that "she was going to get an April Fool's bomb." Again, Grant did not mention those specific calls to police. Although Bray was interviewed by police after the fire, she never mentioned the threats until her testimony at trial.

### SENTENCING EVIDENCE

Rosalie Carson testified that Grant, who she loved, was a good person and took excellent care of her children. When asked about Grant's relationship with her surviving daughter, Carson stated that Grant loved Shylene. Kathleen Carson, Grant's sister, described Grant as grief-stricken over the loss of her sons. Grant's family was deeply hurt by the tragedy, but Kathleen testified that they were standing behind her.

Dr. Jerome G. Miller, President of the National Center on Institutions and Alternatives, prepared a presentence report on Grant. Miller's report indicates that Grant was born in 1960 to Wilma and Charles Grant. Wilma Grant, a prostitute, was described by family members as unpredictable, immature, and at

times violent; she had sixteen arrests and several convictions for various offenses. Rosalie had three sisters, Kitty, Karen and Pauline. Wilma and her mother moved and travelled often, at times leaving the children with friends or relatives.

According to the report, when Grant was twelve she told Carson that Wilma had "gone nuts" and had lined up three of her children, told them not to move, and started shooting. They all, however, escaped. On another occasion, Wilma told her children to hang on to their stepfather, Perry Ford, in order to impede his movement toward Wilma, whom he was threatening. As the children clung to Ford, Wilma stabbed him to death.

The report also stated that Wilma and her mother beat and mistreated the children, and that, according to Charles Grant, Rosalie's father saw them only as a source of welfare income. Charles is not sure that Rosalie is his biological daughter, but accepted her as such upon the advice of Carson, his mother. In his report Miller stated that Grant had positive feelings about her father, although she feared him because he had raped her one night when she was in her early teens.

The report stated that Charles Grant described his mother, Carson, as almost obsessive about insurance, and related that she asked him to pressure Grant into purchasing a policy on her children. After an earlier death in the family, a collection had to be taken up for the funeral expenses, and Carson had found that to be demeaning.

According to the report, Grant had limited employment experiences. She worked one summer in a CETA program, and had attempted to sell Avon products. She attended some high school, but received no diploma. Because of the numerous moves she made, she is unsure about what grades she actually completed.

In her unsworn statement given prior to sentencing, Grant was defiant. She stated that she had wanted to testify in her defense, but that her lawyers had advised against it because they thought the prosecutor had insufficient evidence. She spoke of strange circumstances at her house and of threatening phone calls she received. She said that on the morning of the fire she woke, up, saw that the house was full of smoke, and rushed to rescue her children. However, a laughing man holding a metal pipe or club would not let her into the bedroom. She then went next door and reported the fire.

## VERDICT AND SENTENCING

The jury convicted Grant, as charged, of two counts of aggravated murder and one charge of aggravated arson. Each aggravated murder charge contained two death-penalty specifications, one alleging a course of conduct involving the purposeful killing of two or more people, and another alleging murder during an aggravated arson.

The jury recommended death, and the trial court agreed and sentenced Grant to death. The court of appeals affirmed the conviction and death penalty, and this case is now before this court as of right.

James A. Philomena, Mahoning County Prosecuting Attorney, and Kathi McNabb Welsh, Assistant Prosecuting Attorney, for appellee.

James Kura, Ohio Public Defender, and S. Adele Shank, Assistant Public Defender, for appellant.

Pfeifer, J.

GUILT-PHASE ISSUES

In Grant's first proposition of law, she argues that all visits to her house by police and fire officials on April 1, 5 and 14 were warrantless and, except for the initial fire-fighting efforts, unlawful. The state concedes that the April 5 search was unlawful. Nonetheless, under the circumstances, Chief Cover's testimony based on that search was cumulative and thus its admission was harmless error.

Exigent circumstances justified the warrantless search on April 1. In Michigan v. Tyler (1978), 436 U.S. 499, 510, 98 S.Ct. 1942, 1950, 56 L.Ed.2d 486, 498, the United States Supreme Court recognized that fire officials are responsible not only for putting out fires but also for investigating their causes. Prompt investigation is necessary not only to prevent the recurrence of the fire but also to "preserve evidence from intentional or accidental destruction." Id. at 510, 98 S.Ct. at 1950, 56 L.Ed.2d at 499. In that case, the court sustained a warrantless search for the cause of a fire even though fire fighters left at 4:00 a.m. after extinguishing the fire and investigators returned four hours later to continue their investigation.

In Michigan v. Clifford (1984), 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477, the court found the warrantless entry of arson investigators into a home some five hours after the last fire fighter had left to be unconstitutional. However, contrary to the present case, the owner's agents in Clifford had taken steps to secure their privacy interests and were boarding up the home as the investigators arrived. The investigators in Clifford also extended their search into undamaged portions of the home not involved in the fire.

The April 1 searches here by police and fire officials are constitutionally permissible. Since evidence at a fire scene--such as the odor of accelerants--is ephemeral, and the risk of fire recurrence from an unknown source is real, no warrant is required for a prompt investigation.

Further, the time gap between the visits on April 1 is significantly shorter than the four or five hours involved in either Tyler or Clifford. Fire fighters left the fire scene by 7:51 a.m., and fire investigators Zamary and Naples were called to the scene at approximately 8:30 a.m. and began their search at around 9:20 or 9:30 a.m. Almost uniformly, courts have sustained warrantless searches into the cause of fires conducted within a few hours of fire fighters' leaving the scene. E.g., United States v. Urban (C.A. 6, 1983), 710 F.2d 276; People v. Calhoun (1980), 49 N.Y.2d 398, 426 N.Y.S. 2d 243, 402 N.E.2d 1145; and Annotation, Admissibility, in Criminal Case, of Evidence Discovered by Warrantless Search in Connection with Fire Investigation -- Post-Tyler Cases (1984), 31 A.L.R.4th 194. The fact that Naples and Zamary were not originally at the fire scene does not affect the result. United States v. Urban, supra, at 279; Schultz v. State (Alaska, 1979), 593 P.2d 640; People v. Calhoun, supra, 49 N.Y.2d at 404, 426 N.Y.S.2d at 246, 402 N.E.2d at 1148; Shaffer v. State (Wyo. 1982), 640 P.2d 88.

The police and fire-fighter activity at the fire scene on April 1 was justifiable. Officers Naples and Zamary prudently

included the basement in their fire investigation.  They sought a possible source for the petroleum smell permeating the bedroom and for severe burning near the heating vent and the cold-air return in the bedroom.

Coroner's Investigator Kissos and Detective Landers both arrived in the morning of April 1 while fire investigators were at the scene.  Their searches are encompassed within the fire investigation.  Patrolman Fullerman, who took photographs and collected wire and insulation with fluid on them from the fuse box, simply assisted in the fire investigation.

The results of private insurance agent Brininger's April 14 visit were admissible because his search did not constitute state action barred by the Fourth Amendment.  Brininger entered the property on April 14 for private purposes without official instigation.  Chief Cover, Investigator Zamary, and officer Fullerman were present as a courtesy.  Cover also continued his investigation; Fullerman assisted Brininger with lighting.  In State v. Morris (1975), 42 Ohio St.2d 307, 71 O.O.2d 294, 329 N.E.2d 85, this court recognized that a warrantless search and seizure initiated by private individuals for private purposes does not violate the Fourth Amendment even though police officials are present and participate.

In Grant's second proposition of law, she argues that testimony about the basement fires was inadmissible evidence of other wrongful acts.  However, Evid. R. 404(B) recognizes that evidence of other crimes or acts may be admissible "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid. R. 404(B).  Courts have generally recognized "that evidence of other fires implicating the defendant may be admitted whenever it is shown to be relevant to a contested issue in the case."  Annotation, Admissibility, in Prosecution for Criminal Burning of Property, or Maintaining Fire Hazard, of Evidence of Other Fires (1963), 87 A.L.R.2d 891, 894.

Lighter fluid and burned paper on the fuse box indicated a possible arson effort camouflaged as an electrical malfunction.  The table and door frame fires suggested liquid accelerants.  The existence of these basement fires, not caused by the bedroom fire, tended to prove arson upstairs and negate the possibility of accident.  Moreover, these basement fires tended to show a common plan or scheme and identify Grant as the arsonist.  They could be considered preparation for the successful arson.  Unexplained fires in Grant's residence were relevant to her guilt.

In her third proposition of law Grant claims that the trial court erred in failing to instruct the jury, sua sponte, as to the limited purpose for which evidence of the basement fires was admitted.  Although such a limiting instruction is common, Grant's failure to request such an instruction at trial waived any error.  State v. Davis (1991), 62 Ohio St.3d 326, 339, 581 N.E.2d 1362, 1374.  No plain error is present here since the absence of such an instruction made no difference in the jury's verdict; nothing suggests the jury used this evidence to convict the appellant on the theory she was a bad person.

In her fourth proposition of law, Grant refers to Caldwell v. Mississippi (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231, for the proposition that the trial court compromised the

jury's sense of sentencing responsibility by informing them that their verdict was only a recommendation. However, to establish a violation of Caldwell, an accused must show an inaccurate statement of local law. Dugger v. Adams (1989), 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435. In this case, the trial court's instruction accurately reflected Ohio law, did not lessen the jury's sense of responsibility, and hence did not constitute error. State v. Hicks (1989), 43 Ohio St.3d 72, 79-80, 538 N.E.2d 1030, 1038. The jurors assured defense counsel that their sense of responsibility would not diminish merely because their verdict of death would be only a recommendation.

In her fifth proposition of law, Grant states that the trial judge erred in declining to instruct the jury on the reasons an accused decides not to testify. This argument is without merit. The court did instruct the jury that the defendant had a constitutional right not to testify and that the "fact that the defendant did not testify must not be considered for any purpose."

"A trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." State v. Fanning (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583, paragraph one of the syllabus. However, a trial court need not instruct in the exact language requested by a defendant. State v. Scott (1986), 26 Ohio St.3d 92, 101, 26 OBR 79, 87, 497 N.E.2d 55, 63. In State v. Scott (1987), 41 Ohio App.3d 313, 317, 535 N.E.2d 379, 384, the appellate court did not find error in the trial court's refusal to instruct the jury as requested by the defendant, as "the court's language adequately instructed the jury on the proposed subject." Id. at 317, 535 N.E.2d at 384. In this particular matter, the jury was instructed as to Grant's right not to testify. The instruction was the standard definition set forth in 4 Ohio Jury Instructions (1992) 45, Section 405.21, and was in conformity with the dictates of Fanning.

In her sixth proposition of law, Grant argues prejudicial error because the trial court rejected her proposed instruction on circumstantial evidence, and failed to give a standard instruction from Ohio Jury Instructions. Although the wording of the requested charge and the actual charge were somewhat different, the substance was the same. Additionally, Grant's proposed paragraph on inferences is confusing and redundant. Despite Grant's statements to the contrary, this court has rejected the concept that circumstantial evidence must be "irreconcilable with any reasonable theory of innocence in order to support a conviction." State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus, overruling State v. Kulig (1974), 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897. Further, in neither specifically requesting paragraph three of the standard circumstantial evidence instruction nor objecting to its omission, defendant-appellant waived any objection to omission of that paragraph. The omission was not plain error, as the outcome of the trial would have remained the same. State v. Long (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, 181, 372 N.E.2d 804, 808. The substance of the excluded language was that circumstantial

evidence must be "strong enough to support a finding of proof beyond a reasonable doubt."  The trial court did instruct the jury that the circumstances must be "so convincing as to exclude a reasonable doubt of the defendant's guilt."

In Grant's seventh proposition of law, she argues that Ohio's felony-murder statute requires an "independent, underlying felony" to support a conviction for aggravated murder.  Grant submits that no independent felony existed in her case because arson was the "assaultive conduct" used to kill the children.  She argues that instead of being an aggravating, felonious act independent of the murder, the arson was subsumed into the murder.  Arson, she argues, was used as the means to kill the children -- the children were not killed incidentally to the arson.

Grant asks us to accept that even if she committed murder, she did not separately commit aggravated arson.  Her semantic smokescreen cannot obscure the facts of what actually happened in this case: Grant lit her house on fire!  She "by means of fire * * * cause[d] physical harm to [an] occupied structure," and thus committed aggravated arson.  R.C. 2909.02(A)(2).  As she went through the business of burning the house, she ensured that her sons would have no way of escaping the blaze, and therefore purposely caused their deaths.  Fire was Grant's weapon, not arson.  Fire was used to commit two separate acts, aggravated arson and murder.  Together, those acts constitute aggravated murder.

Grant argues that if the killer "had walked into the children's bedroom and stabbed, shot, strangled, poisoned, or smothered them no charge of aggravated murder based on an underlying felony would stand."  Despite Grant's arguments, this court will decline to take steps to make death by fire a more viable option for Ohio's murderers.

The appellant continues to argue in her eighth proposition of law that murder by arson is not prohibited by Ohio's felony murder statute, R.C. 2903.01(B).  The gist of this argument is that the appellant was not given reasonable notice that her contemplated conduct, killing by means of fire, was forbidden, and that the felony-murder statute is unconstitutionally vague as to her.

R.C. 2903.01(B) is neither vague on its face nor as it applies to the appellant.  It provides: "No person shall purposely cause the death of another while committing or attempting to commit * * * aggravated arson or arson * * *." Burning down an occupied home, known to contain children, in order to kill the children is clearly encompassed within both R.C. 2909.02, the aggravated arson statute, and R.C. 2903.01(B).  If you purposely kill someone by "creat[ing] a substantial risk of serious physical harm to any person" by fire, you have committed felony murder.  The statute could not be clearer.

The appellant's ninth proposition of law, that the death-penalty specification listed in R.C. 2929.04(A)(7) was vague as to her, has no merit.  That section lists as a statutory aggravating circumstance, an offense "committed while the offender was committing [or] attempting to commit * * * aggravated arson."  "Aggravated arson" is defined in terms of knowingly creating a substantial risk of serious physical harm

to any person by means of fire. In the instant case, the appellant purposely killed the victims while committing the felony of aggravated arson. Grant falls within the specific class of persons to which the specification applies. Therefore, R.C. 2929.04(A)(7) is not vague as to her.

In her tenth proposition of law, the appellant argues that she was punished three times for the same act. She contends that separate punishments for aggravated arson and aggravated murder, as well as the death specification for felony murder, violate her rights against double jeopardy and multiple punishments. Additionally, she assumes she did not separately commit the offense of aggravated arson. As previously discussed, the law and facts do not bear out her contentions.

Ohio's statutory scheme of punishment under R.C. 2903.01(B) of both aggravated murder and aggravated arson does not violate constitutional guarantees against double jeopardy. The General Assembly intended that both offenses be separately punished. See State v. Moss (1982), 69 Ohio St.2d 515, 521-522, 23 O.O.3d 447, 451, 433 N.E.2d 181, 186-187; State v. Guyton (1984), 18 Ohio App.3d 101, 18 OBR 464, 481 N.E.2d 650.

Grant also argues that multiple convictions for aggravated murder with death-penalty specifications and aggravated arson violate R.C. 2941.25, Ohio's multiple-count statute. She contends that aggravated arson is an allied offense of similar import to aggravated murder. However, as this court said just last year, "when the elements are compared, aggravated murder and aggravated arson are not allied offenses of similar import within the meaning of R.C. 2941.25." State v. Richey (1992), 64 Ohio St.3d 353, 369, 595 N.E.2d 915, 928.

Grant also argues that the crime of aggravated arson is a lesser included offense of aggravated murder. State v. Kidder (1987), 32 Ohio St.3d 279, 513 N.E.2d 311, paragraph one of the syllabus, provides:

"An offense may be a lesser included offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot, as statutorily defined, ever be committed without the offense of the lesser degree, as statutorily defined, also being committed, and (iii) some element of the greater offense is not required to prove the commission of the lesser offense."

The offenses in the instant case fail to meet this test. Aggravated murder can be committed in a variety of ways. It merely requires "purposefully causing the death of another while committing one of nine specified felonies, of which aggravated arson is only one." State v. Richey, supra, 64 Ohio St. 3d at 369, 595 N.E.2d at 928.

In her eleventh proposition of law, Grant argues that the prosecutor failed to furnish copies of two insurance applications and a prospectus during discovery. Under State v. Parsons (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 488, 453 N.E.2d 689, 692, a court looks to the following when reviewing a potential discovery violation: (i) whether the failure to disclose was willful; (ii) whether disclosure would have aided preparation; and (iii) prejudice.

In this case the trial court acted within its discretion and committed no prejudicial error. There is nothing in the record to indicate, nor did defense counsel ever assert, a

willful failure of discovery. Grant's counsel did not specifically seek additional time to cross-examine Ronald Saunders, Grant's insurance agent. In not doing so, defense counsel appeared willing to go forward without the discoverable information. Grant's counsel was made fully aware of the existence of the policy in question at the preliminary hearing, as he had commented upon it. Counsel for defendant also talked privately with Saunders before trial, revealing his full knowledge of the issues in his cross-examination. Therefore, failure to deliver the documents never prejudiced Grant.

In her twelfth and thirteenth propositions of law, Grant argues that the trial court erred in allowing Coroner Belinky and Fire Chief Cover to testify as expert witnesses concerning the effect of carbon monoxide on the body. Previously, this court has held that the qualification of an expert is a matter for determination by the court and rulings with respect to such matters will ordinarily not be reversed absent a clear abuse of discretion. State v. Maupin (1975), 42 Ohio St.2d 473, 479, 71 O.O.2d 485, 488, 330 N.E.2d 708, 713. Furthermore, an "expert witness is not required to be the best witness on the subject." Alexander v. Mt. Carmel Med. Ctr. (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 504, 506.

The trial court did not abuse its discretion in allowing Dr. Belinky or Chief Cover to testify. At the time, Dr. Belinky had been the Mahoning County Coroner for nine years. Dr. Belinky had worked on prior fatalities by fire and studied the effects of carbon monoxide during his thirty-seven years with the coroner's office. Chief Cover had been a fire chief for eighteen years, had been with the fire department since 1943, and had studied these matters in numerous seminars throughout his career.

No prejudice resulted even if the trial court erred. The defendant cross-examined Dr. Belinky not only in regard to his qualifications, but called her own expert who testified as to the children's cause of death. With respect to Chief Cover, his testimony was largely cumulative to that of Dr. Belinky as he basically described the levels of carbon monoxide necessary to cause death.

Grant's fourteenth proposition of law is decisively not well taken. She states that it was error for the trial court to allow the culling of all prospective jurors opposed to the death penalty. The three jurors at issue indicated that they could not possibly return a death sentence because of their personal views regarding the death penalty. All were released for cause.

This court has previously rejected challenges to the constitutionality of death-qualifying a jury. State v. Landrum (1990), 53 Ohio St.3d 107, 119, 559 N.E.2d 710, 724; State v. Rogers (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of syllabus; State v. Jenkins (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of syllabus. Also, Grant never preserved this issue at trial by objecting to the exclusion of jurors who were not so qualified.

In her fifteenth and sixteenth propositions of law, Grant argues that the lighter fluid can with her fingerprints and the insulation and fluid from the fuse box were ultimately irrelevant. Grant is incorrect. This evidence did tend

identify Grant as the arsonist, a "fact that is of consequence to the determination of the action." Evid. R. 401. Witnesses testified that an odor similar to the charcoal lighter fluid on the fuse box permeated the burned bedroom. A nearby charcoal lighter fluid can contained Grant's fingerprints. Paper ashes above the fuse box indicate a possible contemporaneous arson effort.

Grant's seventeenth proposition of law states that the trial court abused its discretion in not giving requested preliminary instructions. A trial court, however, is not required to give preliminary instructions. State v. Comen (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph one of syllabus; State v. Frost (1984), 14 Ohio App.3d 320, 14 OBR 386, 471 N.E.2d 171. Rather, trial courts may give preliminary instructions at their discretion. Furthermore, the court's final instructions sufficiently covered circumstantial evidence, the presumption of innocence, and burden of proof.

Grant next argues in her eighteenth proposition of law that the evidence is insufficient to convict because the circumstantial case against her is built upon inferences upon inferences, and did not exclude all reasonable theories of innocence. When reviewing such evidence for sufficiency, the evidence must be considered in a light most favorable to the prosecution. Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560; State v. Davis (1988), 38 Ohio St.3d 361, 365, 258 N.E.2d 925, 930. Matters such as the weight of evidence and witness credibility are primarily to be determined by the finder of fact. State v. DeHass (1967) 10 Ohio St. 2d 230, 39 O.O.2d 366, 227 N.E.2d 212. Murder convictions can rest upon circumstantial evidence. State v. Nicely (1988), 39 Ohio St. 3d 147, 151, 529 N.E.2d 1236, 1239. It is no longer the standard, as it was when appellant's brief was filed, that circumstantial evidence must be irreconcilable with any reasonable theory of innocence. State v. Jenks (1991), 61 Ohio St. 3d 259, 574 N.E.2d 492.

Grant lived alone with her two children. At 6:00 a.m., a bedroom fire, aided by a liquid accelerant, caused the death of those children. Although Grant reported the fire, she did not attempt to rescue her children, nor did she suffer any injuries, not even any related to smoke inhalation. She never told police that someone else started the fire and stopped her from rescuing the children, though this was her story in her presentence unsworn statement. Fire investigators found a substance very similar to charcoal lighter fluid on a basement fuse box, and, as noted previously, that same odor permeated the charred bedroom. Police also found a charcoal lighter fluid can with Grant's fingerprints in a vacant building behind Grant's house. Additionally, a burned chair similar to those found in Grant's kitchen was found in that building. Several other small fires of suspicious origin had been set in Grant's basement, but there was no evidence that she had ever directly reported them to the police or fire departments -- she once mentioned to a patrolman investigating a prowler at her house that someone had burned some clothes in her basement. In the month prior to the fire, Grant had taken out life insurance policies on the children who died in the blaze. Her daughter, who did not live with her, remained uninsured.

While that evidence does not lead to a conclusion of Grant's guilt to a degree of unquestionable certainty, it does withstand a sufficiency challenge. Once a jury has reached a decision based on circumstantial evidence, an appellate court will reverse only if no "reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." State v. Jenks, supra, 61 Ohio St.3d at 273, 574 N.E.2d at 503. The evidence in this case demonstrates that this jury reasonably found Grant guilty beyond a reasonable doubt.

The prosecution's case was not based on inferences built upon inferences. Although inferences cannot be built upon inferences, several conclusions may be drawn from the same set of facts. Hurt v. Charles J. Rogers Transp. Co. (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraph three of the syllabus.

In this case, evidence of arson is compelling, and defense counsel conceded arson at trial. As the only adult present, Grant is the logical culprit. Her fingerprints on the charcoal lighter fluid can, charcoal lighter fluid on the basement fuse box, the same smell in the charred bedroom, the unexplained basement fires, her suspicious appearance that day and her recent purchase of children's life insurance all point to her culpability.

A conviction will not be reversed for insufficiency of evidence when a jury "'could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt.'" State v. Johnson (1989), 46 Ohio St.3d 96, 101, 545 N.E.2d 636, 641, quoting State v. Scott (1986), 26 Ohio St.3d 92, 102, 26 OBR 79, 88, 497 N.E.2d 55, 64. The state met that burden here.

Grant next argues in her nineteenth proposition of law that the trial judge erred in allowing a mortician to testify in rebuttal that, despite earlier testimony that Grant had partially assigned the insurance proceeds to pay funeral expenses, no monies had yet been received. Pursuant to R.C. 2945.10(D), the prosecution may call a rebuttal witness. Further, even if the testimony is not in rebuttal to defense testimony, the same statute permits the trial court to deviate from the order of proceedings. In State v. Jenkins (1984), 15 Ohio St.3d 164, 215, 15 OBR 311, 355, 473 N.E.2d 264, 308, quoting State v. Bayless (1976), 48 Ohio St.2d 73, 2 O.O.3d 249, 357 N.E.2d 1035, at paragraph three of the syllabus, this court held:

"'Any decision to vary the order of proceedings at trial in R.C. 2945.10 is within the sound discretion of the trial court, and any claim that the trial court erred in following the statutorily mandated order of proceedings must sustain a heavy burden to demonstrate the unfairness and prejudice of following that order.'"

In proposition of law twenty, Grant argues that the trial court erred in commenting upon her unsworn statement in mitigation. However, the trial court correctly stated the law in regard to the scope of a statement made by an offender during the penalty phase of the trial. The trial court's brief, accurate instruction merely explained that the statement would be unsworn and there would be no cross-examination, an issue which would be relevant to any alert jury. Grant did not

object to the trial court's remark, and the trial court limited its remark to the law, not extensively commenting on the subject. Thus, defendant Grant was not prejudiced. State v. Durr (1991), 58 Ohio St.3d 86, 94-95, 568 N.E.2d 674, 683; State v. Jackson (1991), 57 Ohio St.3d 29, 40, 565 N.E.2d 549, 561.

Grant next argues in proposition of law twenty-one that the trial court improperly excluded relevant sentencing evidence. A defendant does have great latitude in a sentencing hearing under R.C. 2929.04(C), and technical rules of evidence cannot be used to exclude otherwise proper mitigating evidence. See Green v. Georgia (1979), 442 U.S. 95, 97, 99 S.Ct. 2150, 2151-2152, 60 L.Ed.2d 738, 741; see, also, State v. Williams (1986), 23 Ohio St.3d 16, 23, 23 OBR 13, 19, 490 N.E.2d 906, 913; Evid. R. 101(C)(3).

Nevertheless, Grant was not prejudiced by the court's decision to excise the portion of the presentence investigation that described the "state of siege" under which Grant felt she was living before the fire. Her unsworn statement covered the threats, harassing phone calls, and other events leading to the fire and describing this "state of siege."

The court also properly excluded the irrelevant personal opinions of the presentence report's author on the adequacy of the investigation of the crime. A court has authority to exclude erroneous portions of a presentence investigation. State v. Greer (1988), 39 Ohio St.3d 236, 530 N.E.2d 382, paragraph four of the syllabus. Likewise did the court properly deny the author's strong desire to give an opinion on Grant's version of the crime. His personal opinions were neither relevant nor admissible.

The record does not support Grant's assertion that the presentence report never went to the jury. The court accepted the report into evidence; counsel and the court referred to it in argument and instructions; and the jury, having been informed about it, never commented on its asserted absence. Regularity should thus be presumed, including the report's presence in the jury room.

A petition by the friends and family of Grant expressing concern for her was also properly excluded. The petition said nothing about any relevant mitigating factor, and merely expressed the signers' hope that Grant's life would be spared. That decision was the function of the jury in this case, not Grant's friends.

In her twenty-second proposition of law, Grant argues that the trial court abused its discretion in declining to continue the sentencing hearing from October 20 to October 24. The jury rendered its guilty verdict on October 13, and the sentencing hearing was scheduled for October 20. Defense counsel sought an additional four-day continuance, which the court declined.

The grant or denial of a continuance is entrusted to the broad, sound discretion of the trial judge. State v. Powell (1990), 49 Ohio St.3d 255, 259, 552 N.E.2d 191, 196; State v. Unger (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078. Factors to be considered can include the length of the continuance requested, any prior continuance, inconvenience, reasons for the delay, whether the defendant contributed to the delay, and other relevant factors. State v. Landrum (1990), 53

Ohio St.3d 107, 115, 559 N.E.2d 710, 721; State v. Unger, supra.

No abuse of discretion can be established here. Although the requested delay was short, defense counsel had previously represented that they would try to be prepared on October 20. Counsel's choice to concentrate on motions rather than interview witnesses was a conscious tactical decision. "Denial of a continuance requested pursuant to counsel's tactical design is permissible." State v. Landrum, supra, 53 Ohio St. at 116, 559 N.E.2d at 721.

Grant also fails to demonstrate that she was denied effective assistance of counsel in this matter. Grant's counsel presented the testimony and exhibits of several witnesses in mitigation. No prejudice has been demonstrated. State v. Bradley (1989), 42 Ohio St.3d 136, 141, 538 N.E.2d 373, 379.

Grant next argues in her twenty-third proposition of law that the trial court erred in denying a new trial because of irregularity in the proceedings, prosecutorial and juror misconduct, and accident or surprise. Generally, a trial court's ruling on a motion for new trial will not be reversed on appeal absent a clear showing that the court abused its discretion. Toledo v. Stuart (1983), 11 Ohio App.3d 292, 293, 11 OBR 557, 558, 465 N.E.2d 474, 475. Further, Grant demonstrates neither an abuse of discretion nor an error "affecting materially [her] substantial rights." Crim. R. 33(A); State v. Taylor (1991), 73 Ohio App.3d 827 833, 598 N.E.2d 818, 821.

Grant claims that an irregularity arose when Fire Chief O'Nesti interrupted the trial and requested a return of the tape recording of Grant reporting the fire. The trial record shows no interruption, nor has Grant corrected the record to show any interruption. More important, Grant fails to demonstrate how this interruption prejudiced her.

Grant raises as another irregularity the trial court's misleading remark about term insurance during counsel's direct examination of a witness. That comment was harmless.

Despite Grant's contentions, a juror casually asking a testifying detective "how he was feeling" as they passed in the hallway does not rise to the level of reversible misconduct. The requisite prejudice to the defendant is certainly absent. State v. Hipkins (1982), 69 Ohio St.2d 80, 83 23 O.O.3d 123, 125, 430 N.E.2d 943, 945.

The prosecutorial misconduct alleged by Grant is dealt with in our discussion of her second and thirty-fifth propositions of law. Her claim of accident or surprise is disposed of in our discussion of her eleventh proposition of law.

In her twenty-fourth proposition of law, Grant argues that the trial court erred by refusing proffered jury instructions. The court did not include in its instructions requested language regarding sympathy and mercy, residual doubt, appropriateness of the death penalty and mitigation.

A trial court can instruct the jury to exclude sympathy from its deliberations. State v. Steffen (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 285, 509 N.E.2d 383, 396. The court sufficiently instructed the jury on mercy when it told them to consider the mitigating factors "in fairness and mercy." State

v. Jenkins (1984), 15 Ohio St. 3d 164, 191, 15 OBR 311, 334, 473 N.E.2d 264, 290. Appellant requested that the jury be instructed that the burden of proof in sentencing proceedings is proof beyond all doubt. Instead, the court correctly instructed that proof beyond a reasonable doubt is the correct standard. Residual doubt is a mitigating factor included within the "other factors" of R.C. 2929.04(B)(7), and is appropriately considered with the other mitigating factors, and is not to be applied separately after the jury balances aggravating circumstances and mitigating factors.

Appellant requested a separate instruction on the appropriateness of the death penalty. The court's instructions required the jury to recommend death if the aggravating circumstances outweighed mitigating factors. The appropriateness of the death penalty is contained in that consideration.

Finally, appellant argues that the court erred in listing to the jury all of the statutory mitigating factors, even those not raised in the appellant's defense. In State v. DePew (1988), 38 Ohio St. 3d 275, 289-290, 528 N.E.2d 542, 558, this court expressed its preference that the trial court and the prosecution not comment on mitigating factors not raised by the defendant. However, no prejudice resulted to appellant in this case since neither the court nor the prosecutor made any comment to the jury on those factors not raised. Id.

In proposition of law twenty-five, Grant argues that the trial court failed to control the proceedings, resulting in an inadequately made, stored and preserved record of trial. She contends that the court failed to record certain sidebar discussions and bench and chambers conferences, hearings on motions, other "off-the-record" discussions and journal entries.

With respect to the sidebar discussions and bench and chambers conferences, defense counsel never requested that they be recorded, thereby waiving any error. State v. Jells (1990), 53 Ohio St.3d 22, 32, 559 N.E.2d 464, 473. Appellate counsel neither reconstructed what occurred nor demonstrated prejudice. State v. Brewer (1990), 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491, 501-502; State v. Tyler (1990), 50 Ohio St.3d 24, 38, 553 N.E.2d 576, 593.

Six court reporters apparently worked on the record. During the years the case was before the appellate court, the appellant attempted to reconstruct and complete the record. On December 2 1987, case No. 87-632, this court ordered the court of appeals to "hear relator's appeal on the record currently before" it. The court of appeals, after painstakingly reviewing the record as to various defense requests, found the trial record adequate for appellate review. The record explicitly reflected dispositions by the trial court, even though hearings were not held or recorded in all instances. Thus, Grant's allegations that the record is defective in that respect are without merit.

In a perfect world, this record would have reflected statements and testimony given in all hearings and conferences. However, efficient justice would not be served by returning this case to the court of appeals. The record before this court is the same record before the court of appeals when this court made its 1987 decision. We concur with the judgment

of the court of appeals that the record accurately reflects what occurred below and is adequate for appellate review.

In her twenty-sixth proposition of law, Grant asserts that the trial court erred in allowing the prosecutor to elicit testimony and present argument on nonstatutory aggravating circumstances in both the guilt and mitigation phases of trial.  However, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom."  State v. Richey, supra, 64 Ohio St. 3d at 362, 595 N.E.2d at 924.  The prosecutor did introduce evidence regarding Grant's lack of effort to save her children and her seeming calm demeanor at the fire scene.  Such evidence, however, tended to prove Grant's guilt and therefore properly assisted the jury in determining the statutory aggravating circumstances surrounding the crime.

Additionally, the prosecutor's reference to how the children were killed and to their suffering was a permissible response to defense counsel's attempt to minimize the horror of the crime.  Under R.C. 2929.04(B), the jury must consider, and the prosecutor may legitimately comment upon, whether the nature and circumstances of the offense are mitigating. See State v. Stumpf (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.  Comments about the heinous nature of the crime can be considered fair comment.  Therefore, proposition twenty-six is rejected.

In proposition of law twenty-seven, Grant claims the trial court erred by refusing to instruct the jury that the court could impose consecutive life sentences.  However, "the subject of disposition is a matter for the court and not for the jury and, thus, need not be considered by the jury."  State v. Rogers, (1985), 17 Ohio St.3d 174, 182, 17 OBR 414, 421, 478 N.E.2d 984, 992.  In this case the jury was properly instructed as to their possible sentencing recommendations: death, life with possibility of parole after twenty years, and life with possibility of parole after thirty years.  The jury does not have an option of recommending whether life sentences shall run consecutively or concurrently.  Thus, Grant's twenty-seventh assignment of error is without merit.

In her twenty-eighth proposition of law, Grant argues error because the trial court listed all statutory mitigating factors in its jury instructions, although not all were relevant. However, neither the prosecutor nor the trial judge made any comment to the jury on mitigating factors not presented in Grant's defense. State v. Roe (1989), 41 Ohio St. 3d 18, 26, 535 N.E.2d 1351, 1361.  We thus find no error.

In Grant's twenty-ninth proposition of law, she argues that permitting the prosecution to argue last in the sentencing proceedings violated Grant's constitutional rights.  However, that argument lacks merit.  In State v. Rogers (1985), 17 Ohio St. 3d 174, 182-183, 17 OBR 414, 422, 478 N.E.2d 984, 993, this court sanctioned the order of closing argument which was utilized in the present case.  Therefore, this proposition of law lacks merit.

In her thirtieth proposition of law, Grant challenges the current system of proportionality review.  This court, however, has repeatedly rejected such challenges.  State v. Steffen, supra, at paragraph one of the syllabus.  This court has also

repeatedly rejected all but one of the constitutional challenges to the death penalty statute contained in appellant's thirty-first proposition of law.  State v. Jenkins; State v. Maurer, supra.  Appropriately, we continue to do so summarily. State v. Poindexter (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.  We also reject Grant's new contention that the Constitution forbids the death penalty unless the culpable mental state is desire or premeditation and deliberation.

Grant's challenge in proposition of law thirty-four to Ohio's felony-murder provisions also lacks merit and is also summarily rejected.  See State v. Henderson (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237, paragraphs one and two of the syllabus.

In her thirty-second proposition of law, Grant claims that Fire Chief Clover's ninety-six color slides, together with a black and white photograph of the corpses, were taken into the jury room although not admitted into evidence.  This is a speculative claim, and, in an appeal, all reasonable presumptions consistent with the record will be indulged in in favor of the regularity of the proceedings below.  In re Sublett (1959), 169 Ohio St. 19, 7 O.O.2d 487, 157 N.E.2d 324; State v. Frost, supra, 14 Ohio App. 3d at 321, 14 OBR at 387, 471 N.E.2d at 173.  Furthermore, no prejudice resulted.  The photograph was repetitive, and the jury had already seen the slides; other evidence as to the fire scene was abundant. Proposition of law thirty-two is therefore rejected.

In her thirty-third proposition of law, Grant argues that evidence of her April 1 conversation with Coroner's Investigator Kissos violated her Miranda rights.  Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. However, Miranda warnings are necessary only when there has been an arrest or a deprivation of liberty.  Neither occurred here.  Two family members were with Grant in the hospital's grief room where the conversation took place and neither testified that she was under arrest.  Therefore, this proposition of law is without merit.  See State v. Wiles (1991), 59 Ohio St.3d 71, 83, 571 N.E.2d 97, 114; State v. Barnes (1986), 25 Ohio St.3d 203, 207-208, 25 OBR 266, 270, 495 N.E.2d 922, 926.

In her thirty-fifth proposition of law, appellant alleges prosecutorial misconduct.  Most of the acts constituting the alleged misconduct have been dealt with in our discussion of Grant's twenty-sixth proposition of law.  As was stated earlier, Grant's efforts to save her children and her demeanor at the scene were relevant as to her guilt.  The prosecutor's description of what his own mother would do in the same instance was admittedly misconduct but was harmless in light of the entire closing argument and did not constitute a denial of due process.  The details about the children's death and suffering are relevant to the type of fire involved and to the nature and circumstances of the offense.

The prosecutor also twice called the crimes heinous, gave his personal opinion on the appropriateness of the death penalty, twice referred to the fact that the fire occurred on Good Friday, and told the jury that they were the "conscience of the community."  The prosecutor's characterization of the

crimes as heinous was not misconduct, as it was predicated on the evidence. State v. Greer (1988), 39 Ohio St. 3d 236, 251, 530 N.E.2d 382, 400.  Likewise, a personal opinion regarding the death penalty does not constitute error if it is based upon the evidence presented at trial. State v. Durr (1991), 58 Ohio St.3d 86, 96, 568 N.E.2d 674, 684.  There is no error in setting the scene by referring to a date, and in State v. Tyler (1990), 50 Ohio St.3d 24, 40, 553 N.E.2d 576, 595 this court refused to find plain error in allowing a prosecutor's argument that referred to the jury as the "conscience of the community."  Additionally, appellant made no objections to the Good Friday and "conscience of the community" comments.

Appellant also claims that the prosecutor misrepresented the law.  Specifically, appellant argues that the prosecutor stated in his opening statement and closing argument that the grand jury indictment was evidence of guilt.  Again, no objections were made at trial.  Still, the prosecutor merely stated in his opening statement that after the trial was over the jury would understand why the defendant was indicted.  In his closing, the prosecutor went through the three counts of the indictment.  The jury was also instructed that the indictment was not evidence of guilt.  We find no error.

Finally, we find that the prosecutor's statements that the basement fires occurred on the same day as the fatal fire to be nonprejudicial.  There was some evidence that the fuse box fire had happened a short time before the fatal fire.  In any event, the jury had been through days of testimony regarding that issue, and the prosecutor's comments did not render the jury unable to interpret the evidence for themselves.  The prosecutor's comments, if error, were nonetheless harmless beyond a reasonable doubt.

### INDEPENDENT SENTENCE ASSESSMENT

Pursuant to our duties imposed by R.C. 2929.05(A), we now independently review the death sentence for appropriateness and proportionality.

First, the evidence, while circumstantial, establishes beyond a reasonable doubt the specified aggravating circumstance of a "course of conduct involving the purposeful killing of * * * two or more persons," and also establishes that the offense was committed "while the offender was committing * * * aggravated arson" and that the appellant was the principal offender in the commission of the aggravated murder. R.C. 2929.04(A)(5) and (7).  The evidence showed that Grant was the only adult in the house at the time of the intentionally set fire.  She made no real attempt to save the children.  Several smaller fires, unreported to the authorities, had been set in her basement, including one in the fuse box designed to appear like an electrical fire.  The bedroom fire smelled of an accelerant similar to the one used in the fuse box fire.  A sample of the accelerant was taken from the fuse box, and it was found to be very similar to charcoal lighter fluid found in a can in an abandoned house near Grant's home.  The can showed Grant's fingerprints.  In the month prior to the fire, Grant had taken out life insurance on her two children who resided with her, but not on her other child, Shylene, who lived with Grant's grandmother.  Finally, during the course of the investigation, neither Grant nor

anyone else told authorities about anyone who might want to harm her children. Grant did mention early on to an investigator that she was having trouble with one of her sisters, but she later denied making that comment. Only at trial were any alleged threatening phone calls discussed. Only in her presentence unsworn statement did Grant relate her story of a laughing man with a shiny club who prevented her from saving her children. All of the evidence points only to Grant. She is certainly guilty of aggravated murder.

The nature and circumstances of the offense provide no mitigating features. Rosalie Grant burned her children alive. As long as men have been recording their thoughts, the idea of a mother killing her children has been seen as the ultimate crime:

"Gone, gone for nothing are your maternal pangs. For nothing did you bear these lovely boys, O woman, who made the inhospitable passage through the grey Clashing Rocks! Why let your spleen poison your heart? Why this murderlust, where love was? On the man that spills the blood of his kinsmen the curse of heaven descends. Go where he may, it rings ever in his ears, bringing sorrows and tribulations on his house. Listen, listen. It is the cry of the children. O cruel, ill-starred woman." Euripides, Medea, in Ten Plays by Euripides (Hadas and McLean trans. 1960) 59.

There is some mitigation regarding appellant's background. Grant has had a difficult life. She witnessed the stabbing death of her stepfather at the hand of her mother. Her abusive mother threatened her with death, and saw Grant and her sisters as a way to receive welfare funds. Grant had very little education and was seldom employed.

However, Grant had a good relationship with her paternal grandmother. She lived virtually rent free in a house owned by her grandmother. Her relationship with her father was fairly close, and she had a good number of friends. Life could have been much worse for Rosalie Grant, but she was still raised in an environment where human life was not greatly valued.

This court is all too often faced with death penalty defendants who have had abusive childhoods. It is generally the rule rather than the exception for these defendants to have had a highly troubled past. The question becomes how much weight to accord that, to determine at what point basic human values should override any history of neglect. In this case, the crime committed was so severe, its abhorrent nature so apparent, that nothing in Grant's past mitigates against our applying the maximum punishment allowed by law.

Regarding the seven statutory mitigating factors in R.C. 2929.04(B), factors (1), (2), (3), and (6) do not apply: the victims certainly did not induce or facilitate the offense, the defendant was not provoked, the defendant demonstrated that she appreciated the criminality of her conduct, and the defendant was the principal offender.

The defendant was twenty-two years old at the time of the offense, so her relative youth should be considered a mitigating factor. R.C. 2929.04(B)(4). Also, her lack of a prior criminal record should be considered a mitigating factor pursuant to R.C. 2929.05(B)(5). Still, not much weight should be given to that factor, since Grant's entry into the criminal

ranks was terrifyingly brutal.

Finally, "other factors" can be considered pursuant to R.C. 2929.04(B)(7). Residual doubt is probably the foremost of those in this case. See State v. Watson (1991), 61 Ohio St.3d 1, 572 N.E.2d 97. However, much of our residual doubt comes from our reluctance to believe that anyone could commit such an awful crime, much less the children's mother. However, someone did commit the crime, and all the evidence points to Rosalie Grant. Grant's defiant behavior in her presentence unsworn statement works for and against her -- her continued denial raises the level of residual doubt, but her lack of remorse removes remorse as a possible "other factor."

That Rosalie Grant committed arson in order to murder her two infant sons outweighs the mitigating factors of Grant's troubled childhood, young age, lack of criminal record, and the existence of residual doubt. Thus, the death penalty is appropriate.

This court is also charged with determining whether the death penalty is proportionate to the penalty imposed in similar cases. The death penalty is proportionate when compared to other cases of murder as a course of conduct involving the purposeful killing of two or more persons. See State v. Combs (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071; State v. Montgomery (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; State v. Moreland (1990), 50 Ohio St.3d 58, 552 N.E.2d 894; State v. Cooey, supra; State v. DePew, supra; State v. Brooks (1986) 25 Ohio St.3d 144, 25 OBR 190, 495 N.E.2d 407. When this case is compared with other offenses involving aggravated arson, the death penalty is also appropriate. See State v. Richey, supra; State v. DePew, supra.

Accordingly, the judgment of the court of appeals is affirmed.

Judgment affirmed.

Moyer, C.J., A.W. Sweeney, Douglas and F.E. Sweeney, JJ., concur.

Wright and Resnick, JJ., concur in judgment only.