OPINION
Tracey B. Davis, defendant-appellant, appeals the November 16, 1999 judgment of the Franklin County Court of Common Pleas finding her guilty of obstructing justice, in violation of R.C. 2921.32, a third-degree felony, with knowledge that the crime committed by John Gilcrest was possession of cocaine, a second-degree felony; and assault, in violation of R.C. 2903.13, a fourth-degree felony, which was enhanced by a finding that the assault was against a police officer in the performance of his duties.
The facts in this case leading up to appellant's arrest are disputed. All of the police officers that testified reiterated the same general facts. Appellant and her mother, Peggy Ann Davis, testified to a different version of the facts than the police officers. On November 6, 1998, Columbus Police Officers Daryl Myers, Dave Pulvermacher, Jeremy Ehrenborg, and Kenny McPeek, were conducting surveillance on South 18th Street in Columbus, Ohio, as a result of numerous complaints of drug activity in that area. The officers were set up on the second floor of a school, watching for drug activity at a housing complex nearby. The four officers testified that they observed a male, John Gilchrist, over a period of several days, standing in front of a building and selling drugs out of Apartment K. The officers stated that, during this time, Gilchrist would repeatedly walk in and out of Apartment K between transactions. Apartment K was rented by appellant's mother, Peggy Ann Davis.
Myers and McPeek testified that on November 6, 1998, appellant was with Gilchrist, when a second female walked up to them to buy drugs. McPeek was watching from the school building and gave Myers, Ehrenborg, and Pulvermacher a signal to arrest Gilchrist. The three officers rode their bikes toward the group. McPeek testified that the second female fled and appellant and Gilchrist ran toward Apartment K. However, after appellant ran into Apartment K, she apparently locked the door and Gilchrist pounded on the door to get in. Pulvermacher and Ehrenborg wrestled with Gilchrist as he tried to get into the apartment. Myers testified that appellant then opened the apartment door, grabbed Gilchrist by the arm, and attempted to pull him into the apartment. Gilchrist slipped out of his coat, revealing a gun in his waistband, and ran through the doorway and past appellant. Pulvermacher, Ehrenborg, and Myers testified that appellant pushed the door in attempting to keep the officers from entering the apartment.
Myers testified that he shoved past appellant and saw Gilchrist running upstairs to the second floor. As Myers began to pursue Gilchrist, appellant grabbed Myers by the legs, causing him to fall to the floor. Pulvermacher and Ehrenborg pulled appellant off of Myers, and the three officers ran upstairs to the second floor. As they ran up the steps, they passed appellant's mother, who was holding appellant's daughter. When they reached the upstairs, Gilchrist was gone, and they found that a window screen had been taken out. Next to the open window, they found cash, a pistol, and "Chore Boy," a scrubbing pad that is used as a filter in crack pipes.
The officers then went back downstairs and two other officers, Glenn Bray and Kelly Hamilton, assisted in arresting appellant. Ehrenborg testified that appellant identified the male running through the house as her boyfriend, John Gilchrist, whom Ehrenborg recognized from prior contacts. Ehrenborg stated that after telling appellant she was under arrest, she resisted and began yelling. Hamilton stated that she heard Myers say with regard to appellant, "[s]he is under arrest." Hamilton testified that appellant then backed away from Myers, so she grabbed appellant's arms from behind. As she was trying to gain control of appellant in order to handcuff her, appellant wrestled free and hit Hamilton in the face with her left hand. Hamilton testified that appellant's arms were not flailing wildly and out of control; rather, she swung around and landed a "solid" punch. Bray testified that appellant had been told she was under arrest but continued to throw her arms. He then saw appellant swing around and strike Hamilton in the face.
McPeek also stated that appellant was upset, fighting, and attempting to get away from the officers. They eventually handcuffed appellant behind her back. Because she continued to struggle and kick as they tried to put her into the cruiser, she was "maced" and then placed in a "hobble strap," which is a black nylon strap that goes around the ankles and attaches to the handcuffs. McPeek testified that they recovered a crack pipe that fell from appellant during the struggle and a baggie of marijuana.
Appellant was taken to a police substation and then to Columbus Police Department Headquarters. The officers found a slip of paper in the pocket of Gilchrist's jacket with appellant's name written on it indicating she had privileges to visit Alexander Davis, her uncle, in the Franklin County Jail. Myers testified that they filed second-degree felony drug charges against Gilchrist for the two bags of crack cocaine recovered in Gilchrist's jacket. McPeek testified that they also filed charges against Gilchrist for carrying a concealed weapon.
However, appellant and her mother, Peggy Ann Davis, testified differently than the police officers as to the events of November 6, 1998. Appellant's mother testified that she had seen appellant at work that day, and then appellant came to visit her at her apartment that evening. She said that Gilchrist was also at her apartment for "a minute," but did not come into the house, and was not wearing a coat. She, appellant, and appellant's daughter, walked Gilchrist to the bus stop. After coming back home, she was watching television with appellant's daughter while appellant was in the kitchen when somebody ran through the front door, upstairs, and out her window. She said that appellant then went outside to see what had happened. Appellant's mother then testified that when appellant came back into the house, she was with a police officer and was "hog tied." She testified that appellant did not help the man inside the house and that her front door opens easily even when it is locked. She testified that appellant and the officers in her house just "talked," and appellant was not arrested while she was in the house. She didn't see appellant slap the police officer. She also testified that the officers were wearing all black and did not have white shirts on but that she knew they were police officers.
Appellant testified that on November 6, 1998, she went to work to get her paycheck and was told that her mother had stopped by to see her. Appellant testified that her mother's testimony was incorrect, in that she did not see her mother at work that day. Appellant first stated that she made plans to meet Gilchrist after work when she saw him that morning at a friend's house, but then she later stated that she made the plans when she talked to him over the phone while she was at her friend's house. Appellant then cashed her check, met up with Gilchrist, and went to her mother's apartment. She, her daughter, Gilchrist, and her mother, sat at her mother's apartment for a "couple" of hours. Gilchrist told her he had to go to his aunt's house, so they all walked him to the bus stop. After getting back to the apartment, appellant testified she was looking out the door "for a minute" because there were a lot of people outside in the courtyard. She then walked to the kitchen, and while she was in the kitchen, somebody ran through the house. She stated that she did not help the person get into the house and does not know the person.
Appellant further testified that after a "couple minutes," another person ran into the house dressed all in blue followed by others. She testified that the people had masks over their faces and she didn't know they were police. "Five or ten minutes" after the first officers ran in, other officers came in wearing white shirts and clip-on ties. Although appellant reiterated these time frames, appellant later agreed with her attorney's statement that she was not a good judge of time.
Appellant testified that the officers did not announce at any time that they were police officers, and when the officer grabbed her arms from behind, she was hysterical. However, she later testified that after the officers came back downstairs and said that Gilchrist had gotten away; she knew they were police officers. She testified that she was first handcuffed in the apartment. Appellant's answers during trial were unclear as to when she was told that she was under arrest — before or after Hamilton grabbed her arms. She admitted that she hit her, although she said she did not mean to. Further, she denied kicking, screaming, and struggling with the officers as they tried to arrest her. However, when the prosecution then asked whether they maced her for no reason, she replied, "[n]o, I'm not saying that."
Appellant admitted that she had marijuana on her when she was patted down, but stated it was her friend's. She also said that although she did go to see her uncle in jail the day before, she put the visiting slip on the front table in the apartment, and she had never seen the black jacket in which the police claimed they found the visiting slip. She denied that she told the police during the police interview that it had been Gilchrist who ran through the house. Appellant testified that she knows it is illegal to possess or sell drugs and to carry a concealed weapon. She also stated that those are serious crimes and felonies. Although appellant testified that she had a prior theft offense from a Schottenstein's store in 1996, she claimed the theft was for baby formula for her baby. However, the prosecution presented rebuttal testimony from a Schottenstein's security officer that no formula was among the clothing items appellant had attempted to steal from Schottenstein's.
Appellant was charged with obstructing justice and assault on a police officer. A jury trial was held, after which the jury returned a verdict of guilty on both counts. The court sentenced appellant to three years of community control, four months imprisonment, drug evaluations and other post-incarceration requirements. Appellant appeals the judgment of the trial court, asserting the following three assignments of error:
ASSIGNMENT OF ERROR NUMBER ONE:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE CHARGE OF OBSTRUCTING JUSTICE WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE STATE FAILED TO PROVE THAT THE DEFENDANT HARBORED OR CONCEALED ANYONE.
 ASSIGNMENT OF ERROR NUMBER TWO:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE CHARGE OF OBSTRUCTING JUSTICE WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN THE STATE FAILED TO PROVE THAT THE UNDERLYING CRIME WAS COMMITTED. THE TRIAL COURT ALSO COMMITTED PLAIN ERROR WHEN IT INSTRUCTED THE JURY THAT THE MERE ISSUANCE OF THE INDICTMENT AGAINST ANOTHER IS SUFFICIENT EVIDENCE TO PROVE THAT A CRIME WAS COMMITTED BY THAT PERSON.
 ASSIGNMENT OF ERROR NUMBER THREE:
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT ON THE CHARGE OF ASSAULT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION AND THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. THE TRIAL COURT ALSO COMMITTED PLAIN ERROR WHEN IT FAILED TO INSTRUCT THE JURY ON ALL THE LAW NECESSARY TO RESOLVE THE CASE.
Appellant asserts in her first assignment of error that the evidence was insufficient to sustain a conviction for obstructing justice, and the conviction was not supported by the manifest weight of the evidence. Specifically, in the first assignment of error, appellant asserts that the state failed to prove the element of obstructing justice that she harbored or concealed anyone. This argument raises two separate issues: sufficiency of the evidence and manifest weight of the evidence, which require slightly different analyses.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained the distinctions at length:
 With respect to sufficiency of the evidence, "`sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia (1979), 443 U.S. 307 * * *.
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."). Id. at 386-387.
Revised Code 2921.32(A)(1) provides, in pertinent part:
 (A) No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, and no person, with purpose to hinder the discovery, apprehension, prosecution, adjudication as a delinquent child, or disposition of a child for an act that if committed by an adult would be a crime or to assist a child to benefit from the commission of an act that if committed by an adult would be a crime, shall do any of the following:
(1) Harbor or conceal the other person or child[.]
With regard to the sufficiency of the evidence argument, we find that there was sufficient evidence to find that appellant harbored or concealed Gilchrist. Appellant claims that because the police were aware of Gilchrist's entry into the apartment and he ran through it only for a few seconds, it cannot be said that appellant "harbored" or "concealed" him. Appellant cites no case law or authority to support her argument.
The state cites our decision in State v. Claybrook
(1978), 57 Ohio App.2d 131, for the proposition that appellant's acts of preventing the apprehension of the suspect sought by the officers was sufficient for a conviction of obstruction of justice. In Claybrook, the police were attempting to execute an arrest warrant. After the police officer arrived at the suspect's residence, the officer first noticed the suspect standing on the porch and then going inside the residence. The officer went to the front door and knocked. The defendant, who did not reside at the residence, answered the door and blocked the officer's access to the suspect. The defendant also attempted to convince the officer that the officer had not seen the suspect and instead saw a fifteen-year-old neighbor. We find the findings and facts inClaybrook persuasive.
In the present case, the state's evidence, which the trier of fact found to be credible, was sufficient on the element of "harboring" and "concealing." Appellant pulling Gilchrist out of the clutches of the police officers and into the apartment, appellant attempting to pull the door shut again to prevent the officers from entering the apartment, and appellant tackling Myers by the ankles as he attempted to pursue Gilchrist, were sufficient to prove that appellant "harbored" or "concealed" Gilchrist within the meaning of R.C. 2921.32(A)(1). As we stated in Claybrook, "[i]t is not necessary that harboring or concealing be sufficiently successful to prevent the discovery or apprehension of the suspect for any prolonged period of time." Id. at 135. Thus, even though Gilchrist dashed through the apartment for only a brief period, appellant's delaying tactics are the real issue. See, also, State v. Young (1966), 7 Ohio App.2d 194 (finding that to "harbor" is to receive a person without lawful authority for the purpose of sheltering him from the investigative authorities);State v. Connor (1992), 81 Ohio App.3d 829, 832 (finding that "harboring" or "concealing" requires only an overt act that does in fact hinder the discovery or apprehension of the person sought by the police). The evidence in this case demonstrates that any rational trier of fact could have found that appellant harbored or concealed Gilchrist based upon the testimony of Myers, Pulvermacher, Ehrenborg, and McPeek.
Appellant also argues in this assignment of error that the trial court's decision was against the manifest weight of the evidence. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The main conflict in evidence on this issue was the differing testimony of appellant and her mother against the testimony of Myers, Pulvermacher, Ehrenborg, and McPeek. The officers testified that appellant pulled Gilchrist from them into the apartment, tried to hold the door shut so they could not enter the apartment, and then tackled Myers as he attempted to pursue Gilchrist up the apartment staircase. Appellant and her mother testified that appellant was in the kitchen when an unidentified man burst through the front door and that appellant did not leave the kitchen until the officers were already inside the apartment. Appellant stated that she did not help pull Gilchrist into the apartment.
The jury apparently chose to believe the version of the events put forth by the state's witnesses. The weight to be given the evidence and the credibility of the witnesses are primarily matters for the finder of fact to determine, and it is not the function of the appellate court to substitute its judgment for that of the factfinder. State v. Grant (1993), 67 Ohio St.3d 465;State v. D'Ambrosio (1993), 67 Ohio St.3d 185. We do not disagree with the jury's weighing on the issue of credibility. The testimony of appellant's mother was internally inconsistent and rather confusing in numerous respects regarding the events leading up to appellant's arrest. Her testimony was also contradictory with portions of appellant's testimony, including that she had seen appellant at work that day, that she had seen Gilchrist for only a "few minutes" that day, that Gilchrist had not come into the house, that none of the officers were wearing white shirts, that appellant was not arrested inside the house, and that she did not see appellant slap the officer. Appellant's general credibility could have been tarnished by her statement that her previous theft from a Schottenstein's store was a result of her needing baby formula, which was contradicted by a Schottenstein's security officer who stated that baby formula was not among the items stolen. Further, the jury could have found appellant's testimony not credible given the unlikely temporal estimations between the time that the man ran through her house and the first officers arrived and the time between the arrival of the first group of officers and the second group of officers. Importantly, we find that the evidence does not "weigh heavily against the conviction," and, thus, the finding that appellant "harbored" or "concealed" Gilchrist was not against the manifest weight of the evidence. Based upon the foregoing, appellant's first assignment of error is overruled.
Appellant argues in her second assignment of error that the trial court's finding that Gilchrist committed an underlying crime was not supported by sufficient evidence and was against the manifest weight of the evidence. To sustain a conviction pursuant to R.C. 2921.32, the state was required to prove that an underlying crime was committed by the person being aided by appellant. In order to prove that Gilchrist committed the crime of possession of cocaine, the prosecution relied upon the indictment against Gilchrist and the testimony of several officers.
R.C. 2921.32 does not specify the degree or method of proof required to show that an underlying crime was committed. The state relies upon State v. Mootispaw (1985), 23 Ohio App.3d 142, to support its contention that in order to prove that the underlying crime of possession of cocaine was committed by Gilchrist, an indictment charging such is sufficient. InMootispaw, the court of appeals held that it was not necessary to show that the specific person illegally assisted was actually convicted of a crime and that it was sufficient to show that the person illegally assisted was charged with a crime. The court explained its reasoning, stating:
 Obviously one cannot hinder the prosecution or conviction of another for crime unless a crime has actually occurred. The statute does not require, however, that the specific person being legally assisted be actually convicted of such crime. To hold otherwise would emasculate the purpose and intent of the legislature expressed in unambiguous terms. It is sufficient to show that defendant's husband was charged with a crime, and that defendant hindered his prosecution or conviction. Id. at 144.
Appellant relies solely upon State v. Bronaugh (1980),69 Ohio App.2d 24, in arguing that the prosecution failed to prove that there was an underlying crime committed. In Bronaugh, the Hamilton County Court of Appeals held that the state must establish that an underlying crime had been committed pursuant to R.C. 2921.32. However, as the court in Mootispaw stated with regard to the claim that its decision conflicted with Bronaugh, "we find it clearly distinguishable as in that case there was no proof that any underlying crime had been committed, and no one was charged with such. In the case at bar there was no challenge to the fact that a theft had occurred and that Robert Mootispaw was charged with the offense." Mootispaw, at 144. (Emphasis sic).
In State v. Penwell (Jan. 21, 1986), Fayette App. No. CA85-02-004, unreported, the Twelfth District Court of Appeals adhered to its holding in Mootispaw and again distinguished it from Bronaugh, stating:
 [T]he case at bar and Mootispaw are not in conflict with Bronaugh. Bronaugh does not hold that * * * it has to be shown that the person being illegally assisted has committed a crime. Bronaugh only holds that the state has to show that an underlying crime has been committed; not that the person being illegally assisted committed the underlying crime beyond a reasonable doubt. Penwell, supra.
Unlike Bronaugh, in the present case, there was evidence presented at trial that Gilchrist committed the underlying offense of possession of cocaine. Myers testified that charges were filed against Gilchrist and that the weight of the recovered cocaine was sufficient for a second-degree felony charge. McPeek also testified that field and lab tests of the substance confirmed it was cocaine. Pulvermacher identified the baggies of cocaine at trial as those that he found in Gilchrist's jacket. Further, Myers, Pulvermacher, Ehrenborg, and McPeek testified that they had seen Gilchrist wearing the long jacket that Ehrenborg eventually pulled off of Gilchrist before he was pulled through the doorway. Pulvermacher and Ehrenborg identified the jacket at trial as the jacket Gilchrist had been wearing and in which the cocaine was found. Further, Ehrenborg and McPeek identified a picture of Gilchrist as the man whom they had seen selling the drugs. Appellant testified that she knows it is illegal to possess or sell drugs and that it is a serious crime and a felony. As stated above, the prosecution also presented Gilchrist's indictment, which indicated that he was charged with possession of cocaine, a second-degree felony. Therefore, based upon the evidence and testimony elicited at trial, we find that there was sufficient evidence that Gilchrist committed the crime of possession of cocaine, a second-degree felony.
Although appellant also contends that the finding that an underlying crime was committed was against the manifest weight of the evidence, appellant failed to point to any evidence she presented at trial to counter the evidence presented by the prosecution. Our own review of the record reveals that appellant did testify that she had never seen the black jacket that the prosecution asserted was Gilchrist's and in which they claimed to have found cocaine. Appellant also elicited testimony as to the chain of evidence with regard to the jacket and cocaine and as to who actually collected the evidence from the scene and took it to the property room, but such testimony was not contradictory or challenged in any manner. Appellant also questioned Myers, Pulvermacher, Ehrenborg, and McPeek regarding their identification of Gilchrist from the school building some distance away and the later photo identification at the police station.However, after reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The jury could have believed the testimony of Myers, Pulvermacher, Ehrenborg, and McPeek, and the weight to be given the evidence and the credibility of the witnesses are primarily matters for the finder of fact to determine. See Grant, supra; D'Ambrosio, supra. We find that the evidence does not "weigh heavily against the conviction," and thus, the finding that an underlying crime was committed was not against the manifest weight of the evidence.
Appellant also argues in this assignment of error that the trial court committed error when it instructed the jury that the issuance of an indictment against Gilchrist was sufficient to prove that the underlying crime was committed for the purposes of R.C. 2921.32. Counsel for appellant did not object to this instruction at trial, and, thus, appellant has waived all but plain error. State v. Bey (1999), 85 Ohio St.3d 487, 497. In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. State v. Long (1978),53 Ohio St.2d 91, paragraph two of the syllabus. Notice of plain error must be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. Id., paragraph three of the syllabus. Based upon our above analysis of Mootispaw, Penwell, and Bronaugh, we find that the trial court did not commit plain error in giving the jury this instruction. Therefore, appellant's second assignment of error is overruled.
Appellant argues in her third assignment of error that the jury's conviction for assault was based upon insufficient evidence and against the manifest weight of the evidence. However, appellant admits in her brief that she committed assault and that the only issue is whether her conduct was justified under the circumstances. Appellant asserts that although the trial court instructed the jury on self-defense, it should have also given instructions on the type of force police officers may use while making an arrest and an arrestee's right to defend herself against unnecessary force used by a police officer. Because appellant failed to object to the lack of jury instructions on this issue at trial, our review is one of plain error. See Bey, supra.
Appellant relies upon Columbus v. Fraley (1975), 41 Ohio St.2d 173, in asserting that appellant was justified in striking Hamilton because she was using excessive force to arrest appellant by placing her hands on appellant's arms and by not giving appellant "polite commands to place her hands behind her back to be handcuffed." In Fraley, the Ohio Supreme Court held in paragraph three of the syllabus:
 In the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances.
Thus, the only issue is whether Hamilton used excessive or unnecessary force in holding appellant's arms.
The reasonableness of force is measured by the facts and circumstances of each particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether she is actively resisting arrest or attempting to evade arrest by flight. Grahamv. Connor (1989), 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-1872. Ehrenborg testified that after telling appellant she was under arrest, she began resisting and yelling. Hamilton stated that she heard Myers state with regard to appellant, "[s]he is under arrest." Hamilton testified that appellant backed away from Myers as he approached her and started to struggle, so Hamilton placed her hands on appellant's wrists and elbows from behind. As she was trying to gain control of appellant, in order to handcuff her, appellant wrestled free and hit Hamilton in the face with her left hand. Bray testified that appellant had been told she was under arrest but continued to throw her arms around. He then saw appellant swing around and strike Hamilton in the face.
We find that the method and manner used by Hamilton to effectuate the arrest was not unreasonable. As far as can be determined from the transcript, Hamilton did not use excessive force. The officer placed her hands upon appellant's elbows or wrists as she backed away from Myers after being told she was under arrest. Appellant's actions in backing away from Myers, and her screaming and flailing her arms, factually support Hamilton's actions under Graham, supra. Further, appellant remained standing after Hamilton held her arms, appellant did not allege that Hamilton's actions caused her any pain, and appellant did not claim she was injured as a result of the contact. Thus, it appears no more force was used than was reasonably necessary to arrest and handcuff appellant. Appellant also admitted that at this point, she was "hysterical." Appellant presents no authority or case law to support her assertion that Hamilton's actions could be termed "excessive" or "unnecessary." Therefore, the trial court did not commit plain error in failing to give the instruction appellant now claims should have been given at trial.
After reviewing the entire record, we find that the evidence was legally sufficient to sustain a verdict as to the assault charge and that any rational trier of fact could have found appellant guilty of assault. Further, after weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thus, the verdict was not against the manifest weight of the evidence. Therefore, appellant's third assignment of error is overruled.
Accordingly, appellant's three assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.