JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Jerome Garrett appeals his jury trial conviction for aggravated murder in violation of R.C. 2903.01 and for tampering with evidence in violation of R.C. 2921.12.
 {¶ 2} The events in question occurred after a long weekend of partying by defendant and his buddy, James Atkins. Defendant and Atkins had gone to a bar after Atkins' wife threw Atkins out of the house. At the bar, they met a group of people, including two women who allowed the men to go home with them and stay overnight. Defendant shared a bedroom with a woman named Sara, and Atkins shared one with a woman named Helen. Atkins stayed at the women's house through Tuesday evening, but defendant left the next morning, Sunday, and did not return until ten or ten-thirty Monday night.
 {¶ 3} Meanwhile, on Monday, after he reported to his parole officer, defendant then began drinking at one in the afternoon. While drinking in a bar, he struck up a conversation with the victim, Kim Jones, at around three PM. They had been playing pool and drinking for several hours when defendant left the bar area to use the men's room. When he returned, he noticed that his zippo lighter was missing and accused the victim of stealing it. The victim denied having the lighter, and the two argued about it for around fifteen minutes. Finally a woman who was bartending intervened and ordered the victim to remove everything from his pockets. The search did not turn up the lighter, but defendant refused to believe that the victim did not have it.
 {¶ 4} Because the men were drunk and disruptive, the bartender ordered them to leave the bar at around six-thirty PM. They proceeded to a house where the victim had rented a room from Ed Cyrus (landlord) and his girlfriend, sixty-two-year-old Mary Mex. Defendant stated that they were going to the victim's home so the victim could get marijuana for defendant to smoke.
 {¶ 5} The testimony concerning the events at this house is inconsistent. The landlord testified that defendant told him that the victim had taken his lighter and that he would kill him if he did not get it back. The landlord further stated, "while we were sitting there, he reached with his left hand in his coat and pulled this knife and comes across my chest, like this. Do you know how fast I could have killed you? I told him to get the F out of my house." Tr. at 404.
 {¶ 6} Defendant, on the other hand, testified that when he entered the kitchen, Mary Mex was sitting at the kitchen table preparing crack cocaine. In defendant's version of the events, he went up to the victim's room, which he described in his testimony. After he returned to the kitchen, he saw Mex chopping garlic. He looked at her and said, "nice try," which comment angered the landlord Shorty, who ordered him to leave. Mary Mex denied having any cocaine and also testified that she saw defendant with the knife and heard him threaten the victim. She stated that defendant and the victim were at the house for around forty-five minutes to an hour. Tr. at 816.
 {¶ 7} Defendant and the victim proceeded to another bar where they stayed for around forty-five minutes. Because the landlord feared that defendant might hurt the victim, the landlord followed them to the second bar. He expressed his concerns to a woman who tended bar there, whose testimony corroborated his concerning the events at the bar. The two men drank quietly and left after around forty-five minutes. After the landlord determined that the two men were getting along without problems, he returned home. The victim was never seen alive again.
 {¶ 8} As to the rest of the evening, defendant said he smoked the bowl of marijuana behind the bar, then proceeded down the street with the victim. Defendant states that because he was splashed by a car, they returned to Shorty's where defendant waited on the porch while the victim got him a change of clothes. He says he changed on the porch and they continued on. According to defendant, they then saw Atkins driving a car. Atkins refused to give defendant a ride, but, after being introduced to the victim, Atkins took the victim in his car so they could look for cocaine. Defendant said he then went to a former girlfriend's house to look for clothes but was unable to get in, so he then went to Sara and Helen's house. Atkins denies, however, ever meeting the victim or seeing defendant that night before defendant appeared at Sara and Helen's.
 {¶ 9} In response to Atkins' and the landlord's testimony, defendant stated on cross-examination that he was being framed by Atkins and that the landlord was also involved in the conspiracy against him. The record contains no evidence, however, to show that Atkins and the landlord had ever met each other. According to defendant, Atkins met the victim for the first time on the evening of the murder.
 {¶ 10} According to Sara and Helen's testimony, defendant appeared at their house between ten and ten-thirty that evening. He had a black garbage bag with clothes in it and a can of kerosene. He spoke with Atkins, who testified that defendant asked him to help dispose of evidence by burning defendant's clothes because he had just killed someone over a lighter. Atkins stated that defendant also asked him to drive defendant in Helen's car to the West 67th and Dennison area so he could burn the body. Atkins said he and Helen refused to help defendant, who became agitated. Both defendant and Atkins agree that Atkins put him into a headlock, but Atkins claims defendant pulled a knife out of his back pocket and brandished it against Atkins. Defendant denies having a knife that evening. Atkins and Helen both testified, however, that defendant then went into the back yard and set the bag of clothes on fire and later rubbed his knife in the grass in the front yard to clean it and stuck it in the ground.
 {¶ 11} The people in the house called the police, who arrested defendant for menacing. The police testified that Atkins, Sara and Helen told them about defendant's knife, but the police were unable to find it in the dark. These people also informed the police that defendant had destroyed evidence of a murder and directed them to the West 67th and Dennison area, where the police searched for a body without success.
 {¶ 12} The next afternoon, a neighborhood resident using a cut-through near Dennison at West 67th to go from his first job to his second job discovered the victim's body and called the police. An autopsy revealed that the victim had been stabbed eighty-seven times. According to the coroner's testimony, one of the stab wounds had severed his brain from his spinal cord, which injury prevented him from breathing or defending himself. The stab wounds also perforated his trachea and larynx (windpipe and voice box), his heart, both lungs, liver and diaphragm. The autopsy showed no evidence of any defensive wounds, indicating that the victim did not or was not able to fight back. The coroner speculated that the stab which severed the brain from the spinal cord was one of the first, which would account for the lack of defensive wounds and also for the lack of any DNA evidence from the assailant under the victim's nails or in his hands.
 {¶ 13} After discovering the body, the police interviewed the people in Sara and Helen's house. Upon learning about the burned clothing, they searched the area and secured the evidence. They also found a knife embedded in the ground in the front yard.
 {¶ 14} Additionally, the police interviewed the victim's landlord and landlord's girlfriend, Mary Mex. They both told them that defendant had wielded a knife at their home. The landlord relayed the defendant's threats against the victim over the stolen lighter. When the landlord was cleaning out the victim's personal effects, he found the lighter in question on the victim's bed.
 {¶ 15} The police charged defendant with aggravated murder with prior calculation and design; aggravated murder during the commission of a felony (kidnaping); kidnaping; and tampering with evidence. The jury found him guilty of aggravated murder with prior calculation and design and tampering with evidence by burning the clothes he was wearing at the time of the murder. He was sentenced to twenty years to life for the murder conviction and five years for tampering with evidence, to run concurrently.
 {¶ 16} He timely appealed his conviction. Defendant states five assignments of error, the first of which states:
 {¶ 17} "I. The trial court, by failing in its affirmative duty to prevent bias and prejudice in accordance with R.C. 2945.03, denied Mr. Garrett his constitutional right to a fair trial, pursuant to U.S. Constitution Amendments VI XIV and Ohio Constitution Article I. Sections 10 16."
 {¶ 18} Defendant claims that the trial court failed to present an impartial demeanor at trial and thereby prejudiced the jury against him. He claims that the court's interactions with the prosecutors were too friendly, whereas its interactions with defense counsel were too abrupt: "[t]he jury * * * hears the colder tone and infers who the Court seems to favor." Appellant's brief at 11. He also claims that the court failed to "reign in an overzealous, sarcatic prosecutor" and participated too actively in the trial. Id. at 12. Defendant specifically points to two instances in the trial as particularly egregious. In the first, defense counsel itself created the situation by initiating a line of questioning on cross-examination which ended up being prejudicial to defendant. One of the witnesses, Atkins, the man defendant asked for help in burning his clothes and the victim's body, had been held in jail in protective custody to ensure his appearance at trial. Atkins had been placed inadvertently in the same holding cell as defendant immediately prior to testifying. Defense counsel tried to elicit an admission from him that, while conversing with defendant in the holding cell, he had admitted to defendant that he had never seen defendant with a knife. Atkins answered that because defendant had been trying to persuade him to lie about the knife on the stand, he was "playing him for my own safety." Tr. at 622. "I was scared to death. I was playing into whatever he said a little bit." Tr. at 626.
 {¶ 19} Atkins was clearly afraid of the whole process of testifying. He repeatedly stated that he thought he should have had the opportunity to consult an independent attorney for his own protection. He did not understand why he had been locked up as a witness, and he was intimidated by being in the same small cell with defendant.
 {¶ 20} Defendant argues that as a result of this testimony, "the prejudice caused by the State's witness stating his life was threatened by erroneously being put in the same cell as [defendant] just previous to taking the stand, is so inflammatory and prejudicial, it is reversible error." Appellant's brief at 17.
 {¶ 21} Because defendant never objected to this testimony below, we review this assignment of error under the plain error standard. "Notice of plain error under Crim.R. 52(B) is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St.2d 91, paragraph three, syllabus.
 {¶ 22} First, although Atkins stated that he was "scared to death," an idiom generally used as hyperbole, he never stated that he felt his life was actually threatened. In fact, Atkins agreed no "physical confrontation" occurred.
 {¶ 23} Second, we note that defense counsel himself initiated this line of questioning and elicited the statement he now objects to. Defense counsel also made no attempt to request a jury instruction limiting the jury's consideration of Atkins' testimony. Although this attempt to undermine a witness's credibility certainly did not help defendant's case, we cannot say, given the volume of evidence against him, that this discussion resulted in a manifest miscarriage of justice. In his attempt to impeach the state's witness, defense counsel made a tactical decision which backfired. The fact that he elicited testimony prejudicial to his client does not constitute plain error.
 {¶ 24} The second allegedly prejudicial occurrence was during the prosecutor's closing arguments, when the court asked defendant's mother to either stop disrupting the court by coughing and sighing loudly or leave the courtroom. Defendant argues that this interchange unduly prejudiced the jury against defendant by showing the court's alignment with the prosecutor. The incident occurred after the court overruled a defense objection during the state's final closing argument and the judge heard a sound emanating from defendant's mother. The court said, "Mrs. Garrett, if you don't like the Court's ruling, it is probably better —." At that point, defendant's mother interrupted the court, saying, "I coughed, Your Honor." The court warned her, "please don't test the court." The court then merely reminded her to be quiet and "step out in the hallway, than [sic] if you have to sigh." Tr. at 1652.
 {¶ 25} From a transcript it is difficult to determine the volume or nature of the mother's vocalizations. It is unlikely, however, that the court would interrupt the prosecutor unless the mother's sounds were noticeable. A cough or a sigh, depending on its volume, can be distracting to those listening to a person speaking. It is clear that the court considered the mother's vocalizations disruptive. We cannot substitute our judgment for that of the trial court, particularly when we have no way of knowing the volume, type, or length of the sounds referred to. "[I]n an appeal, all reasonable presumptions consistent with the record will be indulged in favor of the regularity of the proceedings below." State v. Grant (1993), 67 Ohio St.3d 465, 483, citations omitted. After the court issued a warning, the matter was dropped. It does not appear from the record that this brief interaction was prejudicial to defendant.
 {¶ 26} Defendant also claims that the trial court showed favoritism to Atkins, the state's witness, when the judge supplied him with a word he was searching for during his testimony. He was telling the court that he is able to do things with both hands, but could not come up with the correct term. The court stated, "Ambidextrous." The court immediately apologized, saying, "I apologize to you all because I should not do that. You asked him about his left and right, and what is that word, and I told him. I'm sorry." Tr. at 615-616.
 {¶ 27} Nothing about this discussion suggests that the judge was biased toward the witness when she volunteered a technical term on neutral matter. Rather, it reveals that she was attentive to the testimony. Although she is correct in her apology and should not have interjected herself into the testimony, defendant fails to show that this event prejudiced defendant in any way. Nothing else in the transcript of Atkins' testimony indicates any bias on the part of the court toward the witness. Again, we presume the regularity of the proceedings of the trial court. Grant, supra.
 {¶ 28} Accordingly, the first assignment of error is overruled. For his second assignment of error, defendant states:
 {¶ 29} "II. The trial court denied Mr. Garrett due process of law by failing to dismiss Counts II III of the indictment in accordance with Criminal Rule 29, because none of the elements of kidnaping had been proven by the state."
 {¶ 30} Defense counsel moved for acquittal on all the charges at the end of the state's case and again at the end of the defendant's case, which motion the court denied both times. Defendant now argues that because the state failed to present evidence to support the two charges involving kidnaping, he was unduly prejudiced by the court's denial of his Crim.R. 29 motions. The jury acquitted defendant on both these counts, however, so he was not prejudiced by the court's denial of his motion to acquit on them. The final outcome was the same as it would have been if the trial court had granted the Crim.R. 29 motions: defendant was acquitted on the kidnaping related charges. In a case with similar facts, the Supreme Court of Ohio held that acquittal rendered the Crim.R. 29 motion moot. State v. Williams (1996), 74 Ohio St.3d 569,577. We therefore reject the argument that the trial judge improperly overruled the Crim.R. 29 motion. Accordingly, the second assignment of error is overruled.
 {¶ 31} For his third assignment of error, defendant states:
 {¶ 32} "III. The trial court committed plain error when it failed to dismiss the indictment against Mr. Garrett for want of speedy trial [sic] pursuant to R.C. 2945.71 et seq."
 {¶ 33} Defendant was arrested on March 12, 2001. Trial did not start until July 23rd, well beyond the statutory limit of ninety days for an incarcerated defendant. R.C. 2945.71 states in pertinent part:
 {¶ 34} "(C) A person against whom a charge of a felony is pending:
 {¶ 35} "* * *
 {¶ 36} "(2) Shall be brought to trial within two hundred seventy days after his arrest.
 {¶ 37} "* * *
 {¶ 38} "(E) For purposes of computing time under divisions (A), (B), (C)(2), and (D) of this section, each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days. * * *"
 {¶ 39} Because defendant was held from March 12th until his trial, which was finally held on July 23rd, he obviously was held for over ninety days before his trial. At the beginning of the July 23rd trial, the trial court addressed defendant's speedy trial motion. The prosecutor pointed out to the court that a parole hold had been put on defendant the day after he was arrested. The parole officer was available to testify that a valid parole holder was in place, but defendant waived his testimony and stipulated to the existence of the holder, a copy of which was entered into evidence.[1]
 {¶ 40} A parole holder is an order executed by the parole authority directing the jailer to hold the defendant for violation of his parole, regardless of whether the current charges against him are dropped or remain in place. In other words, once the parole holder is in place, defendant is being held at the direction of the parole authority and not on the charges against him.
 {¶ 41} Defendant cites to State v. Martin (Nov. 19, 1992), Cuyahoga App. No. 61437, 1992-Ohio-5859 to support his assertion that the parole holder against him was not a valid means of preventing application of R.C. 2945.71(E). The Supreme Court of Ohio, however, has held otherwise: "The existence of a valid parole holder prevents application of the triple-count provisions of R.C. 2945.71." State v. Brown (1992),64 Ohio St.3d 467, 479. This court, moreover, expressly overruled Martin
in State v. Mann (1993), 93 Ohio App.3d 301, stating: "[W]e find Brown
dispositive of this issue and further hold that the Supreme Court of Ohio's holding in Brown clearly overruled by implication this court's decision in Martin." Id. at 314. See also, State v. Miller (June 27, 1996), Cuyahoga App. No. 69309, 1996-Ohio-2721. "`Thus, the triple-count provision of R.C. 2945.71(E) is inapplicable to a defendant held in jail under a parole holder, even when there are additional criminal charges pending. * * *'" Brown at 479, quoting State v. Dunkins (1983),10 Ohio App.3d 72, 74-75.
 {¶ 42} In the case at bar, the record clearly shows that a valid parole holder was in place against defendant. His claim of lack of speedy trial, therefore, lacks merit and is overruled.
 {¶ 43} For his fourth assignment of error, defendant states:
 {¶ 44} "IV. The misconduct of the prosecutor violated Mr. Garrett's right to a fair trial guaranteed by the due process provisions of Article I, Section 16 of the Ohio Constitution and theFourteenth Amendment to the United States Constitution."
 {¶ 45} Defendant argues that the prosecutor's "demeanor and remarks throughout the trial, especially during closing argument, implied to the jury that the burden of proof had shifted" to defendant. Appellant's brief at 26. He claims that the prosecutor "chose to belittle, berate and badger [defendant] personally and ridicule his defense, which was total innocence." Id. Defendant's only support for these assertions, however, consists of his claim that the state provided no physical evidence connecting him to the crime, but instead relied on circumstantial evidence. He provides no logical connection between his assertions about the prosecutor's demeanor and remarks and the fact that the prosecutor's case relied on circumstantial evidence.
 {¶ 46} A person's demeanor cannot be gleaned from words on paper. As the Supreme Court of Ohio pointed out in State v. Smith (2000),87 Ohio St.3d 424 when this same argument was made, "[t]he defense attempts to persuade us to find pervasive prosecutorial misconduct in this case based largely on generalities and a few specific examples."Smith at 445. See also, State v. Larkin (Aug. 17, 2001), Hamilton App. No. C-000572, 2001-Ohio-3607. Vague allegations concerning tone of voice and demeanor are difficult to substantiate. Not having observed the mannerisms of the people at the trial, we must defer to the trial court's determination of propriety. Grant, supra.
 {¶ 47} Further, an objective reading of the transcript reveals no evidence of sarcasm or untoward remarks by the prosecutor implying a shift in the burden of proof. Although defense counsel objected several times to the prosecutor's "shouting" at defendant during defendant's cross-examination, the court overruled these objections and explained that the prosecutor just has a loud voice.[2]
 {¶ 48} In the case of State v. Smith (2000), 87 Ohio St.3d 424,443, the Supreme Court of Ohio found that even though the prosecutor's cross-examination of defendant was rough, or "brash and theatrical, [it] was neither improper nor unfair." As in Smith, defendant invited the line of questioning pursued by the prosecutor when defendant stated that he left the victim with Atkins on the night of the murder and thereby strongly implied that Atkins, and not he, was the murderer. Defendant's defense was based on a conspiracy theory in which the landlord, Atkins, and Helen worked together to frame defendant for the murder. In order to poke holes in his theory, the prosecutor properly questioned defendant. Although his questioning was aggressive, it was not abusive. Rather, the prosecutor was merely persistent in pointing out discrepancies in defendant's alibi theory in order to impeach him.
 {¶ 49} Finally, defendant specifically cites the prosecutor's closing argument as prejudicial and claims it was an appeal to the jurors' emotions. After outlining in detail the discrepancies in defendant's story, the prosecutor concluded by stating: "You know, Kim Jones shouldn't have had to die like that. Wild animals are shown more mercy than this. Yet, this guy is sitting here on the stand smirking and crying at you and lying right in your face.
 {¶ 50} "He expects you to walk him right out of this courtroom. Just walk him right out of this courtroom and put him back on the street. In the meantime, Kim Jones lies in his grave, never to be seen by anyone, never to be seen by his family, and there is nothing you can do about that.
 {¶ 51} "You can't bring him back, but, ladies and gentlemen, this isn't over. The State of Ohio, the people of the State of Ohio, are in this courtroom asking for justice. Yes, justice.
 {¶ 52} "Justice isn't just for criminal defendants. There is justice for the family that is never going to see this 38 year old guy again. There is justice for the people of the State of Ohio, and there is only twelve people on this planet that can deliver justice in this case, and that's you.
 {¶ 53} "To walk this guy out of this courtroom you got to believe what he said. What he said is utter nonsense. You have circumstantial evidence. You have threats. You have the murder weapon and you have the confession of the killer sitting right there, and it's your duty to find him guilty as charged." Tr. 1663-1664.
 {¶ 54} Defendant also objects to the prosecutor's discussion of motive when he said, "don't be concerned about motive. That's as good a motive as an ex-con like him could have anyway, and yet you can take into consideration his criminal record. Not because he is a criminal, he did this, but because you can use that to judge his credibility.
 {¶ 55} "Judge his credibility on the stand. You saw how he had an explanation for everything. Well, his credibility is zero, and if his credibility is zero, then when he says I didn't do the killing, he is lying." Tr. 1662-1663.
 {¶ 56} First, we note that the defense never objected to this portion of the closing argument and thereby waived the issue for appeal absent plain error. Long, supra. Further, the portions of the state's closing argument to which there was an objection amount to three-and-a-half pages from a closing argument of ninety-two pages. As the Supreme Court of Ohio noted in State v. Lott (1990), 51 Ohio St.3d 160, when reviewing a claim of prosecutorial misconduct, the relevant inquiry for an appellate court is, first, whether the prosecutor's remarks actually were improper, and second, if they were, whether any of defendant's substantial rights was adversely affected. State v. Lott
(1990), 51 Ohio St.3d 160, 165. Further, as the Court noted in another case, in determining whether the remarks objected to were prejudicial to the accused, the appellate court must review the entire closing argument. State v. Keenan (1993), 66 Ohio St.3d 402, 401. The Court has held that wide latitude is appropriate for both sides in their closing "as to what the evidence has shown and what reasonable inferences may be drawn therefrom.' Lott, supra. Reversal is warranted only if the prosecutorial misconduct "permeates the entire atmosphere of the trial."United States v. Warner (C.A. 6, 19920, 955 F.2d 441, 456, certiorari denied (1992), 505 U.S. 1227, 112 S.Ct. 3050. See also, State v.Tumbleson (1995), 105 Ohio App.3d 693.
 {¶ 57} In the case at bar, we first find that some of the challenged statements by the prosecutor were not improper. For example, when the prosecutor stated that "wild animals are shown more mercy," he was merely commenting on the brutality of the murder with the extraordinary number of stab wounds. As the Supreme Court of Ohio found in State v. Tibbets 2001 Ohio 132, 92 Ohio St.3d 146, 168, "the prosecutor's comments here were aimed at describing the purposeful and brutal nature of [defendant's] acts. * * * Contrary to [defendant's] assertions, these remarks appear to be * * * fair comment on the evidence."
 {¶ 58} Sometimes, when outlining reasons for finding defendant guilty, the prosecutor was supporting his case, not expressing his personal opinion concerning the defendant's credibility as appellant argues. When the prosecutor said defendant's "credibility is zero," the prosecutor did not cast this assessment as a personal opinion. Even if the comments were perceived to be his personal opinion, their weight would not have been enough to affect the outcome of the trial. While "[i]t is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused[,]" Statev. Smith (1984), 14 Ohio St.3d 13, 14, "the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes." Smith v. Phillips (1982), 455 U.S. 209, 220, fn. 10.[3]
 {¶ 59} Other comments, however, were improper. The prosecutor's statement that the defendant is "lying," goes beyond the issue of credibility; it is a comment on defendant's moral character. And when the prosecutor says "lying right in your face," the comment further invites the jury to be personally insulted by defendant's testimony. When the prosecutor additionally describes the defendant as "sitting here on the stand smirking and crying at you" and then goes on to say the defendant expects to walk "right out of this courtroom," the comments invite the jury to be additionally insulted by the arrogance which the prosecutor attributes to defendant. The prosecutor is improperly inviting the jury to respond emotionally in an attack on the defendant's character.
 {¶ 60} The impropriety of this technique to distract the jury from its task of determining guilt continued when the prosecutor next asks for justice, especially "justice for the family" of the deceased and justice "for the people of the State of Ohio." Such oratory is similar to the comment in State v. Hart (March 14, 2002), Cuyahoga App. No. 7956, in which the prosecutor "invited the jury to evaluate the fairness of the judicial system as a whole instead of evaluating the guilt or innocence of [defendant]." As in Hart, we must find these remarks improper for the same reasons.
 {¶ 61} However, although "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking * * * [,]" "[i]n order to rise to constitutional proportions, an improper prosecutorial remark must cause substantial prejudice to the defendant." U.S. v. Monaghan
(1984), 741 F.2d 1434, 1441, 1443.
 {¶ 62} In the case at bar we conclude the comments do not rise to the level of plain error, because defendant would have been convicted even in their absence. Tumbleson, supra, at 700. Cf. State v. Smith
(1984), 14 Ohio St.3d 13, 14; State v. Holmes, (Oct. 21, 1991), Butler App. No. CA 90-06-113, 1991-Ohio-5031, at *17-26. The evidence in the case at bar overwhelmingly favors conviction. (See discussion below under Assignment of Error five.) The outcome of the trial, therefore, would not have been different. Accordingly, the fourth assignment of error is overruled.
 {¶ 63} For his fifth assignment of error, defendant states:
 {¶ 64} "V. The verdicts were against the manifest weight of the evidence."
 {¶ 65} Defendant argues that because none of the scientific evidence connects him with the murder, the manifest weight of the evidence does not support his conviction. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence
sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducingbelief.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Dictionary, emphasis in original opinion.
 {¶ 66} The scientific evidence which defendant so strongly claims would have been pivotal consisted of seven stray hairs found on the victim, one in his hand and the others on his clothing, none of which matched defendant's; some red dots on the knife, which tested weakly positive for blood but did not provide any DNA evidence; the lack of fingerprints; and the lack of DNA evidence on the body.
 {¶ 67} As the prosecutor pointed out in his closing argument, the few stray hairs found on the victim could have been picked up on the victim's clothes anywhere. The victim was lying in the "cut-through" for thirty-six hours in the rain. During that long period the body was exposed to all kinds of unknown possibilities, including hair that may have been on the ground even before the body arrived. The body was in a shortcut that might be expected to contain evidence of humans who had used the path. The fact that none of the seven hairs found on the victim matched the defendant's DNA, therefore, is not dispositive of anything.
 {¶ 68} As for the lack of fingerprints, defendant had wiped the knife in the grass, and the handle of the knife was such that a full print would have been difficult to obtain. Moreover, it was raining on the night in question, so much DNA evidence could have been washed away. As the trace evidence expert witness noted, dirt is one of the most effective agents for destroying DNA evidence, and the knife had been pushed into the ground, where it stayed for nearly thirty-six hours. It is possible, furthermore, no DNA evidence of the defendant was found on the victim's body because, as the coroner pointed out, he probably was paralyzed by a stab wound to his brain before he could make any defensive moves. The coroner pointed out that the nature and direction of the wounds indicated that the victim was lying down when they were inflicted. The victim might not have had an opportunity, therefore, to pull at his assailant's hair or scratch his face.
 {¶ 69} Defendant further argues that the state's case is weak because it is purely circumstantial. The Supreme Court of Ohio, however, has held: "Circumstantial evidence and direct evidence inherently possess the same probative value." State v. Jenks (1991), 61 Ohio St.3d 259,272.
 {¶ 70} Although there was no eyewitness testimony of the murder itself, the state provided testimony from witnesses documenting defendant's whereabouts throughout the day except for the window of time in which the murder occurred. The evidence also corroborated defendant and the victim's heavy drinking on the day in question, as well as the fact that they were together throughout the day until they left the second bar, after which the victim was never seen alive again.
 {¶ 71} The state also provided testimony from a stranger in the first bar and the landlord, both of whom heard defendant threaten the victim if he did not return the lighter. Further, the landlord and his girlfriend identified the knife taken from Sara and Helen's front yard as the knife defendant had threatened the landlord with at their house just before the murder. Additionally, both Helen and Atkins testified that they saw defendant with this same knife after the murder, and Atkins stated he saw blood on the knife.
 {¶ 72} All the witnesses from Sara and Helen's house, that is, Atkins, Sara, and Helen, stated that defendant had a bag of clothing when he arrived at around ten or ten-thirty, and that he did not have it when the police arrested him. Although Sara denied that defendant had the can of kerosene, Atkins and Helen stated they saw him with it. Sara did admit she found her children playing with it later and took it from them. All three witnesses from the house agreed that a bag of clothing was set on fire in the backyard on the evening defendant was arrested there for menacing.
 {¶ 73} Sara's confirmation of those details is important because her testimony was the most favorable to defendant, and she admitted that she has visited defendant in jail two or three times a week since his arrest, even though she had only known him forty-eight hours prior to his arrest. But even Sara admitted in her testimony that as the police were taking defendant away on the night of his arrest, Atkins told her the reason defendant was being arrested was for destroying evidence of a murder. When the prosecutor asked her how Atkins could have known about the murder when the body was not discovered until the next day, Sara had no explanation. Tr. at 1061-1062. Because the body was not found until the next day, none of the occupants of the house could have known about this without defendant's admitting it to them.
 {¶ 74} The prosecutor's questioning of these witnesses plainly exposed the holes in their testimony, whereas the defense attorney's questioning of the state's witnesses only strengthened the credibility of the state's theory of the case.
 {¶ 75} We find that the manifest weight of the evidence clearly shows that the state proved its case beyond a reasonable doubt, and the lack of scientific evidence is inconsequential.
 {¶ 76} The fifth assignment of error is overruled.
Affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KENNETH A. ROCCO, P.J., and ANN DYKE, J., CONCUR.
[1] Defendant, pro se, also filed a motion for continuance on May 29, 2001 in which he states he agreed "to waive my time regarding the speedy trial statues [sic] from June 4, 2001 until August 22, 2001."
[2] The appellate judges on this panel confirm that this prosecutor has a naturally resonant voice.
[3] Cf. State v. Thornton, Cuyahoga App. No. 80136, 2002-Ohio-6824.