[Cite as *State v. Romine*, 2011-Ohio-6774.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PICKAWAY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 11CA1 |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | DECISION AND |
| v. | : | JUDGMENT ENTRY |
| | : | |
| ALLEN W. ROMINE, | : | |
| | : | **RELEASED 12/22/11** |
| | | |
| Defendant-Appellant. | : | |

_____
APPEARANCES:

Michael D. Hess, Circleville, Ohio, for appellant.

Judy C. Wolford, Pickaway County Prosecutor, and Matthew L. O'Leary, Pickaway County Assistant Prosecutor, Circleville, Ohio, for appellee.
_____
Harsha, P.J.

{¶1}     Following a jury trial, Allen Romine was convicted of complicity to burglary and complicity to theft.  The charges stemmed from an incident in which Romine, Sandy Au Yeung, and two others purportedly went to the home of Ray Bean to steal a safe and ultimately took three televisions.  On appeal, Romine contends that his conviction for complicity to burglary was against the manifest weight of the evidence because the State failed to show that he purposely aided and abetted Au Yeung in committing burglary.  Romine contends that the jury lost its way in crediting witness testimony connecting him to the crime.  However, we leave credibility determinations to the finder of fact.  And because the jury could reasonably return a guilty verdict based on the State's version of events, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction.

I. Facts

{¶2}   A grand jury indicted Romine on one count of complicity to burglary, a third-degree felony, and one count of complicity to theft, a fifth-degree felony.  Romine pleaded not guilty to the charges, and the matter proceeded to a jury trial.

{¶3}   Ray Bean testified that Heaven Smith lived with his family as a foster child until around August 13, 2010 when a court sent her to live with her grandmother.  On August 22, Bean and his wife went to a car show.  Bean's adopted children and other foster children were not home either.  Bean told Smith about the car show before she moved out.  As they prepared to leave the show, an officer arrived and said Bean's home had been broken into.  Bean testified that he kept his bedroom door locked, but the door was kicked in and a television was missing.  Bean testified that he had a safe in his bedroom; however, he did not testify that the safe or its contents were missing.  He did testify that a television was missing from his son's bedroom.  In addition, a $3,000, 250 pound, 65 inch plasma television was missing from the family room.  Bean testified that Romine came to his home once "sometime in the summer time" to "see [Smith] or he was driving down the street and saw her or something."  Bean saw Romine in the driveway talking to Smith and spoke to him for a few minutes.

{¶4}   Officer Justin Kaszycki of the Ashville Police Department testified that on August 22, 2010 he was on patrol with Officer Donald Mayse.  As they drove near the Bean residence, Kaszycki did not see any familiar vehicles in the driveway but instead saw a black, two door Monte Carlo with the trunk open.  He looked at the front door and saw two white males wearing white tee shirts and black gym shorts carrying a large television out of the house.  Kaszycki found it suspicious that they were moving such a

large television in a two door vehicle.  Both men had brown hair and buzz cuts.  One man was facing Kaszycki and the other had his back to him.  The man facing Kaszycki had a surprised look on his face.  Because of the distance and similar appearance of the men, Kaszycki could not say whether Romine was the man facing him or not.  Kaszycki alerted Officer Mayse to the suspicious activity, and Mayse turned the cruiser around.  By the time they started to re-enter the roadway, the two men loaded the television in the trunk (where it stuck out about three feet) and exited the driveway at a "high rate of speed."  By the time they caught up to the vehicle, the men were gone.  Both doors were "wide open," and the front seats were pushed forward.  Kaszycki saw two females "scatter around [a] house" – he apprehended one and Mayse apprehended the other.  He assumed the women were in the back seat based on the position of the front seats.

{¶5}    Officer Mayse testified that while on patrol, Kaszycki said he saw two men carrying a television from the Bean residence and that it looked suspicious.  Mayse glanced back and saw two men carrying something but could not tell from his angle what.  He turned the cruiser around in a parking lot, but before he returned to the road he saw a Chevy backing out of the driveway at a "very high rate of speed."  He also saw something, which appeared to be a large television, hanging out of the trunk.  By the time he caught up to the vehicle, the occupants had already bailed out and left the car running.  Mayse saw a female to the right of the vehicle walking away briskly.  He saw a male and another female run behind a house.  Mayse approached the walking female, who he later identified as Au Yeung.  He found a small weapon in the area where he stopped her.  Mayse noted the "grips were coming off of it."  Mayse testified that Officer

David Woodie found the missing grip on Romine.

{¶6} Officer Woodie testified he responded to a call for a burglary in progress and went to Mayse's location. He saw a black, two door vehicle with no occupants. He learned officers had two females in custody and started to search for two male suspects. Woodie saw a man two houses east of where the alleged burglary occurred wearing clothing that met the description of the suspects' clothing, i.e. a white shirt and dark colored shorts. Woodie identified the man as Romine. They made eye contact and Romine started walking west while Woodie turned his cruiser around. By the time Woodie made contact with Romine, he was walking on the sidewalk in front of the Bean residence. Romine was sweating and breathing heavily as though he had been running. Woodie asked Romine why he was running, and Romine said he "didn't want to get caught up with what the others were doing." During a pat down search, Woodie found a "side of a grip" from a small handgun on Romine and put him in the cruiser for safety purposes. Woodie testified that Romine was not wearing gloves, and he did not recall finding gloves in his pockets. Woodie testified that he later apprehended Roderick Carmichael, who was hiding in a bush near the area he found Romine.

{¶7} Smith testified that she is 17 years old and spent six months as a foster child living with the Beans. She moved out on August 10, 2010 but returned to "do the robbery" with Au Yeung, Carmichael, and Romine. Smith testified that she is not related to Au Yeung, but refers to her as "Aunt Sandy." In addition, Smith testified that Romine was Au Yeung's boyfriend, and Carmichael was her mother's boyfriend. According to Smith, on the day of the incident she and Carmichael went to his grandmother's house. She called Romine and Au Yeung to see where they were. Romine said "I've got your

cousin's car and I'll be there to pick you up."  Romine and Au Yeung picked up Smith and Carmichael.  Romine asked Smith if they were "still going to do it," and she said yes.  Smith testified that she knew the Beans would be at a car show that day, so the four went to their house to look for a safe.  While Romine drove, he explained the plan.  Smith testified:  "[Romine] said [Au Yeung] was going to go up and knock on the door, and him and [Carmichael] was going to go in, and I said well, their son might be home.  And so, well I've got a gun and I'll just show him the gun."  Smith stayed in the car.  Romine and Carmichael carried two small televisions, and as they carried a 55 inch flat screen outside, officers went by, saw them, and did a u-turn.  According to Smith, the men got in the car, and they "took off."  They hit a dead end, so Romine told them to get out and run.  Everyone ran except Au Yeung, so Smith walked back to her because she "didn't want [Au Yeung] to go down by herself * * *."  Smith testified that she admitted to theft and complicity to burglary charges.  Smith acknowledged that the day of her arrest, she told police that "it was all [Au Yeung]" and Romine knew nothing about the plan.

{¶8}    Au Yeung testified she used to date Romine.  The day in question, Romine borrowed someone's car, and the pair picked up Smith and Carmichael and went to the Bean house "[t]o commit burglary and theft."  Earlier that day, Au Yeung's grandmother kicked her out, and she needed money for a place to live and to feed her addiction to pain pills.  Smith was not supposed to come to the house, but Romine had only been to the Bean residence once when Smith was a foster child there and did not know exactly how to get there.  Au Yeung thought they would find two safes in the home, but they did not.  Instead, she and Carmichael each took a small television out of the house.  Then while Romine and Carmichael carried a big television out together, an

officer drove by and looked right at them. The men rushed to put the television in the trunk, everyone got in the car, and Romine sped off. Au Yeung had a gun at the Bean house, but it fell out of her waist band. She yelled to Romine when she saw it on the ground. He picked the gun up and put it in his pocket. Then as he drove, he took the gun out and threw it on her lap. Au Yeung testified that she entered a plea to the burglary but had not been sentenced yet.

{¶9}    Au Yeung admitted that after her arrest, she told detectives that she "committed the burglary and stuff" and that Romine had no knowledge of it. She also admitted that she wrote letters to Romine apologizing for pointing a gun at him. However, Au Yeung claimed she lied because she still cared about Romine, and he convinced her that because she had not been in trouble before, if she took all the blame she would not get into trouble. According to her, Romine made statements in letters to her indicating that she needed to lie to keep him out of trouble.

{¶10}   Amy Jones, Romine's girlfriend, testified that she was at his home the morning of the burglary. They heard someone knock on a window but ignored the person. When the person knocked on the door, Romine went outside. She looked out, saw Au Yeung, and eavesdropped on their conversation. Au Yeung was "crying hysterical, you know, and he was telling her that it's over, it's been over, and she said well, would you do one last thing for me, help me move some of [Smith's] things that she needed moved, and then I'll leave you two love birds alone." When Jones left, Romine and Au Yeung were getting in a car to leave together.

{¶11}   The jury found Romine guilty of both charges. After sentencing, Romine filed this appeal.

## II.  Assignment of Error

**{¶12}**  Romine assigns the following error for our review:

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT
OF THE EVIDENCE.

## III.  Manifest Weight of the Evidence

**{¶13}**  In his sole assignment of error, Romine contends that his conviction for complicity to burglary was against the manifest weight of the evidence.[1]  "In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed."  *State v. Brown*, Athens App. No. 09CA3, 2009-Ohio-5390, at ¶24, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.  A reviewing court "may not reverse a conviction when there is substantial evidence upon which the trial court could reasonably conclude that all elements of the offense have been proven beyond a reasonable doubt."  *State v. Johnson* (1991), 58 Ohio St.3d 40, 42, 567 N.E.2d 266, citing *State v. Eskridge* (1988), 38 Ohio St.3d 56, 526 N.E.2d 304, at paragraph two of the syllabus.

**{¶14}**  Even in acting as a thirteenth juror we must still remember that the weight to be given evidence and the credibility to be afforded testimony are issues to be determined by the trier of fact.  *State v. Frazier*, 73 Ohio St.3d 323, 339, 1995-Ohio-235, 652 N.E.2d 1000, citing *State v. Grant*, 67 Ohio St.3d 465, 477, 1993-Ohio-171, 620 N.E.2d 50.  The fact finder "is best able to view the witnesses and observe their

---

[1] In this assignment of error, Romine focuses on the complicity to burglary conviction and does not argue that the complicity to theft conviction was against the manifest weight of the evidence.

demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. City of Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (per curiam). Thus, we will only interfere if the fact finder clearly lost its way and created a manifest miscarriage of justice. Moreover, "[t]o reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." *Thompkins*, supra, at paragraph four of the syllabus, construing and applying Section 3(B)(3), Article IV of the Ohio Constitution.

{¶15} R.C. 2923.03(A)(2), the complicity statute, provides: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * * * Aid or abet another in committing the offense[.]" Here, the State argued that Romine purposely aided or abetted Au Yeung in committing burglary under R.C. 2911.12(A)(3), which provides: "No person, by force, stealth, or deception, shall do any of the following: * * * Trespass in an occupied structure * * * with purpose to commit in the structure * * * any criminal offense[.]" The "criminal offense" Au Yeung allegedly had purpose to commit was theft under R.C. 2913.02(A)(1), which states: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways: * * * Without the consent of the owner or person authorized to give consent[.]"

{¶16} Romine contends that the jury should not have believed Smith's and Au Yeung's trial testimony that he knowingly participated in the crimes because they initially told police Romine had no knowledge of the plan. Romine argues their first version was the only one worthy of credibility because the women "were apprehended shortly after

the burglary and had no time to fabricate their stories[.]" (Appellant's Br. 4). He claims

that "[o]nly after time to reflect on their stories and plea offers by the State do both

Smith and Au Yeung change their original story." (Appellant's Br. 4).

{¶17} Romine also contends that his behavior was "inconsistent with someone

committing a burglary." (Appellant's Br. 4). He points out that the burglary occurred

during the daytime, he did nothing to conceal his identity, he carried a television out a

front door facing a busy street with no effort to hide his activity, and he did not wear

gloves or anything else that would prevent him from leaving fingerprints behind.

Romine also argues that it is unlikely that he would return to the Bean residence if he

thought he committed a crime there.

{¶18} However, as we explained in *State v. Murphy*, Ross App. No. 07CA2953,

2008-Ohio-1744, at ¶31:

> It is the trier of fact's role to determine what evidence is the most credible
> and convincing. The fact finder is charged with the duty of choosing
> between two competing versions of events, both of which are plausible
> and have some factual support. Our role is simply to insure the decision is
> based upon reason and fact. We do not second guess a decision that has
> some basis in these two factors, even if we might see matters differently.

For the jury to conclude Romine committed complicity to burglary, it had to assess the

credibility of the witnesses and accept testimony regarding Romine's participation in the

events at the Bean residence. Having heard the testimony and having observed the

demeanor of the witnesses, the jury could choose to believe all, part, or none of the

testimony presented by any witnesses. *State v. Parish*, Washington App. Nos. 05CA14

& 05CA15, 2005-Ohio-7109, at ¶15.

{¶19} The jury chose to believe the State's version of events, and we will not

substitute our judgment for that of the finder of fact under these circumstances. The

evidence reasonably supports the conclusion that Au Yeung intended to trespass in the Bean residence with purpose to take a safe, i.e. commit a theft offense, and that Romine purposely aided and abetted her. Au Yeung and Smith testified that Romine drove the foursome to the Bean residence, and Smith testified that Romine explained the plan to get the safe to the group. Although they did not find a safe in the house, Au Yeung and Smith testified that Romine actually carried a large television from the house. The women also testified that Romine drove the vehicle during their effort to evade the police. "Flight from justice may be indicative of a consciousness of guilt." *State v. Santiago*, Cuyahoga App. No. 95516, 2011-Ohio-3058, at ¶30, citing *State v. Taylor*, 78 Ohio St.3d 15, 27, 1997-Ohio-243, 676 N.E.2d 82. In addition, law enforcement testified that at the time of his arrest, Romine had part of a handgun.

{¶20} The jury was free to believe this testimony and believe Au Yeung and Smith when they testified that they were lying to police when they said Romine did not know they were planning to steal from the Bean residence. Likewise, the jury was free to reject Jones' testimony indicating Romine believed he was moving Smith's possessions, especially given the unlikelihood that a 17 year old foster child left a $3,000, 65 inch plasma television in the Bean's family room. And even though Romine points out behavior inconsistent with him having a criminal intent, the jury could easily conclude that Romine was careless or intentionally acted in this manner hoping to avoid suspicion. Thus, after reviewing the entire record, we cannot say that the jury lost its way or created a manifest miscarriage of justice when it found Romine guilty of complicity to burglary. Accordingly, we overrule Romine's sole assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and that Appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pickaway County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

Kline, J. & McFarland, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
        William H. Harsha, Presiding Judge




### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**